RICKMAN *v.* STATE OF INDIANA;
LAWRENCE *v.* STATE OF INDIANA.

[No. 28,728.    Filed January 23, 1952.]

*James W. Ingles,* of Indianapolis, for appellants.

*J. Emmett McManamon,* Attorney General; *John Ready O'Connor* and *George W. Hand,* Deputy Attorneys General, for appellee.

JASPER, J.—Appellants were charged by indictment in two counts with (1) robbery and (2) inflicting physical injury while engaged in the commission of robbery, under §10-4101, Burns' 1942 Replacement. Arraignment was waived, pleas of not guilty were entered, and one appellant filed a notice of alibi. Trial was had by jury, a verdict of guilty under the first count was returned, and judgment and sentence followed.

Appellants assign as error the overruling of their motion for a new trial. They contend that the court committed error in admitting certain evidence over their objection.

The evidence which was admitted over objection arose out of a conversation with a detective sergeant while appellants were under arrest and while in the custody of the police. During the conversation between the detective sergeant and appellants, pages from a black notebook of the officer were referred to and then read to appellants. The record indicates that appellants have maintained throughout that they were not guilty.

The testimony in question, read to appellants, is as follows:

"We received information that we considered realiable and correct that this robbery was committed by a well known Police character named, Wm. Henry Rickman, C/33 years whose last address we found to have been 101B, in the Belmont Housing Project and another Colored man whose name is William 'Bill' Lawrence, Col. 31 years whose last address was 238 W. New York St. where he lived as a roomer. Both of these men were seen the day after the robbery with large sums of money and boasting that they pulled a daylight job that netted them $800:00. On July 12th. 1949 both of these men left the city and there was conflicting rumors as to where they went too. One

report state they left together on a train and the other report is that they left in an old model car with two womwn. One of the women was supposed to be named Mae Ivory and is a sister of Wm. Lawrence. Lawrence told his former employer that he was going to California and told his landlord that he was going to Knoxville, Tenn. His landlord also identified a picture of Rickman as the man who visited Lawrence in his room frequently. Lawrence had no Criminal Record in our Department but we had information that he had served time in Tenn. We also talked to the brother-in-law of Lawrence, Fred Ivory, who is the husband of Mae Ivory and living at 921½ rear n. West St. and he told us that the mother and father of Wm. Lawrence lived at 1408 Dora St. Knoxville, Te He also confirmed the report that Lawrence had served time in Tenn. Fred Ivory also said that Mae Ivory, his wife and sister to Lawrence, left the City for a visit to Knoxville, Tenn. and left by train. This date, July 12th. was also the date that Lawrence and Rickman allegedly left the City. We also talked in confidence with a former girl friend of Rickman's, who told us that she practically knew that Rickman and Lawrence had robbed the Money, Inc. Said she was afraid of bodily harmed if she told anything on Rickman but on our promise to keep her out of the investigation she told us that on the date Rickman left the City, July, 12th. 1949, he had showed her an enormous amount of money and had asked her to accompany him and promised to take her to N. york City. She said she refused to go with him and that he then threatened to kill her if she told anyone that he had all that money or where he said he was going. She said she thought he had around $900:00. She also said that a relative of hers that knew she was keeping company with Rickman knew that he robbed the Money Inc. because that on the day of the robbery he saw Rickman and another man he did not know (But whom she said must have been Lawrence) sitting in the War Memorial Park across the street from the Money Inc. Said he knew that Rickman was a criminal and was curious as to why he was

in the Park and watched him for about an hour when he and the other man got up and walked across the street and into the Money Inc. place. Said they were in there about five minutes and a car drove up and a White man got out and also went into the place. Said a short time later he saw Rickman and the other man walk hurriedly from the place and that he waited around about five minutes to see if anything had happened but did'nt see any Police go into the place and left because he thought he might have been mistaken about Rickman's intentions. Said he did'nt know they had robbed the place until he read the story in the papers the next day and that was when he told her about it. Our difficulty in this investigation lies in the identification of the subjects. Mr. Hunt after viewing a picture of Rickman said he was positive that he was one of the men but oddly enough he says that he would'nt want to say positively until he saw him. Adams only saw one man and on August, 27th. 1949 he came to the Detective Office and viewed the picture of Lawrence in a group of 15 pictures and positively identified him as one of the men. Mrs. Thomson also viewed the pictures of Lawrence and Rickman and identified the picture of Rickman as being one of two men who came into the place a few weeks prior to the robbery and tried to negotiate a chattel loan. In checking further we learned that a Clarence Workins had been granted a chattel loan in April of 1949 and that he was a relative of Rickman's and living at 101 B in the Belmont Housing Project. We also checked and learned that William Lawrence had worked at the Imperial Restaurant in the 400 block Ind. Ave, for a Doyle Smith as a cook and had stopped working the Friday prior to the robbery. This would have been July, 8th. 1949. Mr. Smith also stated that he has seen Lawrence with a large Cal. Automatic on several occasions and that he was afaid of Lawrence. Smith also said that the night of July, 12th. 1949, Lawrence was in the Restaurant with another man and two women. He learned that one of the women was Lawrence's sister which led us to believe that she left the City with he and Rickman. Smith said

he exhibited a billfold stuffed with a lot of bills which was unusual for him have. On or about August, 15th. 1949 we sent a letter to the Knoxville, Tenn. Police Department outlining the facts in our investigation and seeking the criminal history of William Lawrence, Jr. as well as photograph of him. We received a reply from the Knoxville, Tenn. Police Department on August, 24th. 1949 together with a picture of Wm. Lawrence, Jr. and a copy of his criminal history. They also wired the information that Lawrence was arrested in the City of Knoxville, Tenn. on July, 14th. 1949 for Criminal Trespass. There was no mention of the disposition of the arrest. We did'nt advise his apprehension at the time because we had no indictment against him. We also received the information that Rickman has been seen on Smith St. in Galatin, Tenn. which is his home town. The automatic gun that Lawrence allegedly had in his possession could belong to Henry Lee who formerly operated the Coolee Hat Restaurant in the 400 block Ind. Ave. At that time he had a P-38 Automatic stolen from his place and Lawrence was a cook at his place at that time. We are seeking an indictment against Rickman and Lawrence for Robbery & Grand Larceny and for the Commission of Physical Injury in the Commission of a Felony."

The detective sergeant then testified that the appellant Rickman said: "I still didn't rob the place."

Substantially the same evidence was introduced against the appellant Lawrence, except that the name of Rickman was deleted and the name of Lawrence used in its place.

The general rule is that when one charged with an offense, or against whom an accusation is made, remains silent or fails to contradict or explain the testimony, providing the circumstances afford him an opportunity to speak, then the charge or accusation is in the nature of an admission.

*Diamond* v. *State* (1924), 195 Ind. 285, 144 N. E. 250, 466; *Fausett* v. *State* (1942), 219 Ind. 500, 39 N. E. 2d 728. However, in the case at bar the general rule does not apply, and appellants come within the exception to the rule, which is that a charge or accusation made while an accused is being held under arrest does not call for a reply or response on the part of the accused, and the charge or accusation cannot be taken as an admission. *Diblee* v. *State* (1931), 202 Ind. 571, 177 N. E. 261. Appellants being held under arrest, were therefore under no duty to reply or respond.

Appellee contends that, even though the admission of the testimony was error, it was harmless error, since sufficient evidence was introduced against each of the appellants to sustain their conviction exclusive of the testimony of the police officer. A great portion of the above testimony is hearsay, as well as being objectionable on other grounds, and was inadmissible. The evidence being inadmissible, we must therefore determine whether it was harmless. Appellants both denied the robbery, and witnesses testified as to their being at other places at the time the robbery was committed. The rule in respect to the admission of incompetent testimony, which would otherwise be reversible error, is that it may be regarded as harmless where there is. other competent, uncontroverted testimony establishing the issue involved. Every issue covered by the incompetent testimony was controverted by appellants. The introduction of this incompetent testimony was prejudicial and reversible error. *Caveney* v. *State* (1936), 210 Ind. 455, 4 N. E. 2d 137; *Brown* v. *State* (1934), 206 Ind. 223, 189 N. E. 133; *Houston* v. *State* (1932), 203 Ind. 409, 180 N. E. 582.

Appellee further maintains that appellants, in conversation with a police officer, while they were detained

under arrest, invited the reading of the testimony above set out, and, by so doing, made it admissible in evidence. Appellee cited no authority in support of this contention, and we have found none. If appellants did invite the officer to read his report, while they were detained under arrest and before trial, it could hardly be construed as an invitation to read it into evidence at the trial over appellants' objections. It could not be construed as a waiver of appellants' constitutional right to be confronted by witnesses face to face at the trial of the case.[1] Article 1, section 13, Constitution of Indiana. Constitutional rights cannot be held to be waived in any such an oblique manner.

Appellants further contend that without the incompetent testimony there was insufficient evidence. To this we cannot agree. We feel that without the incompetent testimony there was sufficient evidence on each material issue. However, because of the prejudicial nature of the incompetent testimony, this cause must be reversed.

Judgment reversed, and cause remanded for a new trial.

NOTE.—Reported in 103 N. E. 2d 207.

[1] See Right to be Confronted by Witnesses, 14 Am. Jur., Criminal Law, p. 888.