JON LUKAS v. STATE OF INDIANA.

[No. 2-1173A256. Filed July 15, 1975.]

*Lawrence O. Sells,* of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *Robert F. Colker,* Assistant Attorney General, for appellee.

PER CURIAM—Jon Lukas, defendant, is appealing his conviction of sodomy[1] (Count III) and commission of a felony while armed, to-wit: rape[2] (Count IV) for which he was sentenced to the Indiana Department of Correction for not less than two nor more than fourteen years (Count III), and a determinate period of ten years (Count IV).

The facts viewed most favorably to the State reveal that on September 24, 1972, prosecutrix went to the home of her stepfather, defendant, in order to pick up insurance proceeds due her. While in the house defendant allegedly brandished a knife and forced her to have intercourse with him. She testified that shortly thereafter she was forced to perform fellatio on defendant.

Defendant then ordered his step-daughter into his automobile and drove for a short period of time before returning to his garage, where she stated she was again raped. The prosecutrix effectuated an escape from the garage by running across the street to a neighbor's home, at which time the police were summoned.

Defendant admits that he had intercourse with his step-daughter and that she performed fellatio upon him. However, it is argued vigorously that the prosecutrix consented to the above mentioned acts. Defendant relies on his step-daughter's uncontroverted testimony that she often posed nude for photographs for her friend, admitted having intercourse with perhaps as many as thirty men and wrote a lascivious letter to her brother which was admitted into evidence. Additionally, defendant contends that his step-daughter's statement concerning her lack of experience in regard to fellatio was

---

1. IC 1971, 35-1-89-1, Ind.Ann.Stat., § 10-4221 (Burns 1956). (Amended by Acts 1973, P.L. 320, § 3, p. 1732.)
2. IC 1971, 35-12-1-1, Ind.Ann.Stat. § 10-4709 (Burns Supp. 1974).

impeached by later testimony establishing that she created collages using portions of magazine advertisements to depict fellatio from "a woman's viewpoint," and by the letter to her brother.

Defendant's argument is founded upon the admission of testimony by the complaining witness' brother, defendant's step-son, in regard to a conversation he had with defendant while defendant was in the Marion County jail. Testimony of the step-son adduced that after defendant was accused of raping the complaining witness, he failed to respond except for a silent nod of the head and a nervous cough. Defendant argues that testimony concerning the charge against him and his response thereto was inadmissible and that failure of the court to so rule constituted reversible error.

Generally, when one is charged with an offense or has an accusation made against him, and fails to contradict or explain the charge, the equivocal response to the charge or accusation allows both to be admitted into evidence as a tacit or adoptive admission. *Jethroe* v. *State* (1974), 262 Ind. 505, 319 N.E.2d 133; *Robinson* v. *State* (1974), 262 Ind. 463, 317 N.E.2d 850; *Diamond* v. *State* (1924), 195 Ind. 285, 144 N.E. 466.

Indiana, however, has long recognized an exception to this general rule which provides that a charge or accusation made while the accused is in police custody does not call for a reply or a response and the accusation and failure to deny or explain do not constitute an admission. *Thomas* v. *State* (1958), 237 Ind. 537, 147 N.E.2d 577; *Rickman* v. *State* (1952), 230 Ind. 262, 103 N.E.2d 207; *Diblee* v. *State* (1931), 202 Ind. 571, 177 N.E. 261. In *Garrison* v. *State* (1967), 249 Ind. 206, 231 N.E.2d 243, Justice Hunter of the Indiana Supreme Court noted the exception and quoted *Kern* v. *State* (1957), 237 Ind. 144, 144 N.E.2d 705, 706 as follows:

> "The rule is now well settled that if an accused be in custody when such accusations of guilt are made in his presence, he is under no duty to deny them and his silence

is not to be taken as an admission against him, and it is reversible error to admit such evidence over objection."

See also: 22A C.J.S. *Criminal Law,* § 734 (1) (d).

As the following testimony reveals, the prosecution was clearly trying to elicit from defendant's step-son the fact that defendant responded equivocally to accusations of guilt:

"Q. Do . . did you see him after he was arrested?
A. Yes, I did.
Q. When?
A. I'd say, a couple days. I went to the Marion County Jail to see him.
Q. And about what time of the day or night did you see him at the jail?
A. I'd say two or three o'clock in the afternoon.
Q. And where in the jail did you see him?
A. They took me up in an elevator and had me wait in a room and then they brought him into the room. I guess it was a row of cells or something.
Q. Does your step-father have a nervous habit? That makes itself manifested at times when things bother him?
A. Yes. I can't diagnose it myself as being caused by nerves, but he does have a sort of what would appear to be a nervous habit which appears occasionally.
Q. Well, what is this habit?
A. Well he clears his throat or makes a noise with his nose and his mouth and jerks his head around.
Q. Now on the date that you went to visit your step-father in the Marion County Jail, did you have a conversation with him?
A. I did.
Q. Was there anyone else there when you had that conversation?
A. Negative.
Q. Will you tell the jury what he said to you, or what you said to him and what he said to you, if anything including any physical reactions to your comments?
A. Well, I think I did most of the talking. I told him that, you see initially he had, well I guess he had contacted our family attorney and he had referred him to another

attorney and that attorney called me and after talking with him.

Q. Now not what the attorney told you.

A. Well no, I'm not going to say what he told me, but that attorney after having talked to me, declined to take the job, so then he secured Mr. Manahan. Okay. Well so, that was part of the conversation. I told him that I didn't believe his story with respect to what had happened and that his, his attorney that didn't take the job didn't believe it and my brother Mike didn't believe it and of course, Cheryl didn't believe it. I didn't think he was going to convince a jury of his peers to believe it. My recommendation to him was that he tell the truth and not attempt to go into a criminal court with some kind of fabrication and or else he would be convicted of both rape and perjury and I didn't want to see that happen.

Q. Did he have any response, did he respond   . . .

A. Mostly to just nod his head and didn't say anything."

After preliminary questioning, defendant then interposed the following objection:

"Mr. Manahan: We'll object to this whole line then, a speech made to the Defendant in jail is hardly evidence in a criminal case.

Mr. Peters: Well Judge, there has been testimony here that he nodded his head, that he acknowledged as to what was being said, acknowledges what is true, and that maybe he had better take that advice.

Mr. Manahan: The preliminary said he nodded his head through a nervous habit. I don't think you can have a relative of an alleged victim go to jail and make a speech to the man and then come back and repeat it to the jury. That's not evidence of anything.

Court: This was substantially a conversation, although it was substantially a one-sided conversation, nevertheless it was a conversation with the defendant.

Mr. Manahan: But the witnesses testimony was that the Defendant showed no response to the relevance of the conversation. I don't think the statement bolsters the   . . .

Mr. LaGrave: Any verbal response?

Court: Sir. The objection will be overruled."

After the trial court overruled defendant's objection, the prosecution continued:

"Q. Go ahead.

A. Okay. I told him I knew what had happened before. This is what I'm telling my step-father. I said, when she came to me and asked what to do, I told her that rape was punishable by life imprisonment. I said he did something to you that's not right, but we can't take away his job and his house and his son and his whole life, for one error, so instead, we'll get you out of there then we'll leave him up north and then no problem.

Q. What response if any did he make when you related this to him?

A. Just listened. Looked at me, listened and nodded his head.

Q. Nodded his head, which way?

A. Well, like this.

Q. Let the record show that the witness is nodding his head up and down. What happened then?

A. Then I told him, however I said, you made a mistake, you tried it again. You did something and you got away with it but did it again. I said this time when Cheryl came to me and asked me what to do, I still didn't tell her to call the police because she's my sister, your my step-father, but I didn't stop her either. I asked her what she wanted to do and she said she wanted to call the police and I said, so be it and she called them.

Q. What did he do in response to that?

A. The same, nothing verbal, no affirmation, no denial, just that he acknowledged what I was talking about, that he understood it."

Safeguards imposed by the courts upon the potentially dangerous tacit or adoptive admission rule include a showing that the charge was heard and understood and that the prevailing circumstances are such that the accused would naturally be expected to deny the charge. *Robinson* v. *State* (1974), Ind. App., 309 N.E.2d 833; McCormick, Evidence § 270 (2 ed. 1972). When one

is in police custody, the circumstances do not require that he deny all accusations so that failure to do so would constitute an admission.

Introduction into evidence of the conversation between defendant and his step-son while defendant was incarcerated in the Marion County jail, for the purpose of presenting to the jury defendant's equivocal responses to his son-in-law's charges, was erroneous.

In view of the close factual question of whether the complaining witness consented to the acts of intercourse, it is concluded that the admission of the incompetent testimony was prejudicial and constitutes reversible error.

Judgment reversed and cause remanded for a new trial.

NOTE.—Reported at 330 N.E.2d 767.