FAUSETT *v*. STATE OF INDIANA.

[No. 27,582.    Filed February 26, 1942.]

From the Hancock Circuit Court; *John B. Hinchman,* Judge.

Francis S. Fausett was convicted of involuntary manslaughter, and he appealed.

*Waldo C. Ging,* of Greenfield, *Schuyler C. Mowrer, William C. Ewing* and *Marsh & Marsh,* all of Indianapolis, for appellant.

*George N. Beamer,* Attorney General, and *C. Ballard Harrison,* Deputy Attorney General, for the State.

SWAIM, J.—This is an appeal from a conviction of involuntary manslaughter on an indictment which charged the appellant with murder in the first degree.

The appellant relies on two alleged errors: (1) that the trial court erred in overruling the appellant's motion to instruct the jury to return a verdict finding the defendant not guilty; and (2) that the court erred in overruling the appellant's motion for a new trial.

At the conclusion of the State's evidence the appellant filed his motion for a peremptory instruction. After the motion was denied he proceeded to introduce evidence on his behalf. By the introduction of evidence on his behalf, after his motion for a peremptory instruction was denied, the appellant waived

any possible error in overruling said motion. *Delphos Hoop Co.* v. *Smith* (1911), 176 Ind. 29, 95 N. E. 309.

Had the error not been so waived, it still would present no question for the determination of this court because it was assigned as an independent error and not as a ground for a new trial. To be available on appeal such an error must be assigned as a ground for a new trial. It cannot be made the basis of an independent assignment of error. *White* v. *State ex rel.* (1915), 183 Ind. 649, 109 N. E. 905.

The principal contention of the appellant is that the court erred in overruling his motion for a new trial because the verdict of the jury was not sustained by sufficient evidence. The appellant insists that there is no evidence to support the necessary finding of the court that the defendant was engaged in the commission of any unlawful act which resulted in the death of Damon Cook, the decedent. Cook was killed by a charge from a shotgun which was in the hands of the appellant at the time it was discharged. The State contends that the appellant at that time was engaged in the commission of an unlawful act in that he was purposely pointing or aiming the shotgun at or toward Cook in violation of § 10-4708, Burns' 1933, § 2543, Baldwin's 1934. Since the charge entered the body of Cook, it must be conceded that at the time the gun was discharged it was pointed at Cook. The question for our determination is, whether there is sufficient evidence to sustain the inference that the appellant was intentionally or purposely pointing the gun at the decedent. If the evidence furnishes a basis for the inference that the gun was being so pointed or aimed intentionally, the judgment must be affirmed.

It is contended that since the jury failed to find the appellant guilty of murder or of voluntary manslaugh-

ter, and only found him guilty of the crime of involuntary manslaughter, we must necessarily accept the verdict as a finding that the appellant did not intentionally kill the decedent and that, therefore, evidence which might furnish a basis for a finding that the appellant intentionally killed the decedent cannot be used as a basis for the inference that he intentionally pointed the gun at the decedent. With this contention we cannot agree. Evidence which would furnish a basis for an inference by the jury that the appellant voluntarily killed the decedent would necessarily furnish a basis for a finding that appellant intentionally pointed the gun. On the basis of such evidence the jury might properly find that the gun was intentionally pointed at the decedent, in violation of the statute, even though it also found that the gun was not intentionally fired at the decedent. In this case there was some evidence on which the jury might properly have based an inference that the appellant stumbled and accidently or unintentionally fired the gun, although believing that at that time he was intentionally pointing the gun at the decedent.

It has been many times held by this court that a charge of murder in the first degree comprehends every grade of felonious homicide. The crime of first degree murder where, as here, the commission of the offense was by means of a shotgun, would naturally include the unlawful pointing of the gun at the victim. The charge of murder in the first degree would, therefore, comprehend the crime of involuntary manslaughter based on the unlawful pointing of a gun and a death resulting therefrom. This court has held that a finding of involuntary manslaughter cannot be disturbed on appeal because the evidence also furnished the basis for a finding that the defendant was guilty of

murder. *Gipe* v. *State* (1905), 165 Ind. 433, 75 N. E. 881; *Hasenfuss* v. *State* (1901), 156 Ind. 246, 251, 59 N. E. 463.

In the latter case this court said:

"Certainly our decisions may be said to settle the question beyond controversy, and correctly so, that, under the law of this State in all cases of criminal homicide, regardless of the means by which it is committed, the crime is graduated and must be one or the other of the three grades of homicide, namely, murder in the first or second degree, or manslaughter, and that it is in the province of the jury to determine under the evidence of which they will convict the accused."

The real objection here, as was true in *Crickmore* v. *State* (1938), 213 Ind. 586, 591, 12 N. E. (2d) 266, is that the evidence "is too much, and not that it is too little," but as this court said in that case, "Courts have power to set aside a verdict where the evidence is insufficient to sustain it, but no power to set aside a verdict which is sustained by the evidence, because there is no finding of guilt of a higher crime, which the evidence would also have sustained."

In a criminal case the intention of the defendant may be proved by either direct or circumstantial evidence. "All evidentiary circumstances which are relative to, or tend to shed light on, the motive or intent of the defendant or which tend fairly to explain his actions are admissible in evidence against him, although they may have occurred previous to the commission of the offense." 20 Am. Jur. § 340, p. 317. Such evidence is admissible because it tends to prove the intention of the accused and after being admitted it furnishes a basis for a finding by the jury as to such intent.

We believe that in the instant case when we consider the relationship of the parties involved, the circum-

stances surrounding the occurrence and the statements made and the silence maintained by the appellant after the shooting occurred, we find abundant evidence to support the inference of the jury that the appellant herein intentionally pointed the shotgun at Cook.

The evidence disclosed that a few months before the homicide the appellant was led to believe that his wife was seeing too much of Cook and that there was talk in the community about appellant's wife because of her association with Cook. On more than one occasion appellant warned Cook to stay away from the appellant's wife. After one such warning Cook became angry and said to appellant, "I will get you for that and don't you forget it."

The appellant was the owner and operator of a tavern in Fortville, Indiana. On the night Cook was shot the appellant's wife, Marcella, and her mother went to the appellant's tavern. While they were there Cook came into the tavern and seated himself by the appellant's wife. He was then under the influence of liquor and drank more while there. The bartender remonstrated with Cook because of his actions and angry words were exchanged between them. While Cook was sitting by the appellant's wife and talking with her he grabbed her arm, knocked her compact out of her hand and caused her to cry. About 10:30 o'clock p. m., when the appellant's wife and her mother prepared to leave the tavern, the mother asked the bartender to have someone escort them to their automobile because she was afraid of Cook. At the request of the bartender a man did go to their automobile with them. Immediately after appellant's wife and her mother left, Cook also left. Shortly thereafter the appellant came into the tavern and was told by the bartender what

had happened. The bartender told the appellant that Cook had followed the appellant's wife and mother-in-law out of the tavern and suggested that he, the appellant, had better go home; which he did.

Appellant and his wife lived in an apartment on the second floor of an apartment building, a short distance from the tavern. The appellant entered the front entrance of the apartment building, walked up the front stairway and along the second floor corridor to the rear of the building, where his apartment was located. As he came to the door of his apartment, the mother-in-law came running up the rear stairway of the apartment building crying out, "Don't let him hurt Marcella." The appellant grabbed his shotgun from behind the door in his apartment, went down the back stairway, and stepped out into the alley. In the alley he saw his wife parking their automobile and also saw Cook's automobile being driven down the alley toward the apartment building. He called out to Cook to get out of there and then, when the Cook automobile was about twenty or twenty-five feet away from appellant, he fired his shotgun twice into the front end of the automobile. He said that he aimed the gun between the headlights of the automobile; and that the second time he shot, the automobile was backing away from him. A picture of the automobile, introduced in evidence, showed that the shot struck the automobile near the top of the radiator and upon the hood. The appellant then went back upstairs to his apartment, removed the empty shells from his shotgun, loaded it again, and returned to the alley. He again saw Cook's automobile in the alley and walked towards it. The appellant testified that he looked into Cook's automobile; that there was no one there; that just then he heard a step in the gravel and looking up saw Cook about to charge.

towards him; that appellant tried to back up, struck his leg against the bumper of Cook's automobile, stumbled, and that the gun was discharged; the charge striking Cook. The shotgun was a double-barreled, hammerless gun with a safety device which was automatically placed on "safety" when the gun was reloaded. When the safety was on, the gun could be carried in any manner safely, because the gun could not be fired without releasing the safety. The appellant also testified that whenever he raised the gun to shoot he automatically released the safety. He testified that prior to the shooting of Cook he did not knowingly or wittingly release the safety.

When the jury considered all of these facts together, there was a basis for finding that bad feeling existed between the appellant and Cook; that when appellant went down into the alley, knowing that Cook was down there, intoxicated, and threatening appellant's wife, he took the gun along for one of three purposes: (1) to scare Cook; (2) to shoot Cook; or (3) to use it in defending himself, which would also involve either scaring or shooting Cook; that when he shot into the front of Cook's automobile as Cook was driving it away, the appellant showed that he was not defending himself and also that he had no regard for the safety of the decedent. By its verdict, finding the appellant guilty, the jury found that he was not using the gun for his defense.

After shooting into the front end of Cook's automobile the appellant returned to his apartment without his wife, reloaded his shotgun and then again returned to the alley. The reasonable inference was that again he took the shotgun with him for the purpose of either scaring Cook or using it on Cook. When appellant reached the alley the second time he saw Cook's auto-

mobile about 150 feet down the alley. He walked down to the automobile, saw Cook, the gun was discharged and Cook was fatally injured thereby. When the gun was discharged appellant was within a few feet of Cook. Appellant testified that he was carrying the gun down by his side in one hand and that he did not raise it to his shoulder and aim it at Cook. It would be unnecessary for appellant to aim the shotgun from his shoulder in order to strike a target the size of a man which was only a few feet away. In this situation shooting from the level of his hips would be just as effective as raising the gun to his shoulder and taking aim. And if appellant, while holding the shotgun about level with his hips, intentionally pointed it at Cook, this would violate the statute just as much as if appellant had aimed the gun from his shoulder. Such a pointing of the gun would be just as dangerous and would constitute a violation of the statute.

The jury might reasonably have found that the entire circumstances surrounding this occasion would cause any man, experienced in handling a shotgun, to have the gun in an alert position, up in front of him and held by both hands, where it could instantly be pointed at the person he was trying to find. The appellant was in a dark alley. He was hunting a man larger than he, known to be drunk; known to be in an ugly mood; a man who had threatened "to get" the appellant. In view of these undisputed facts it would be very hard to believe that the appellant was carrying the gun, as he said, down at his side, in one hand. As said by this court in *DeLange* v. *Cones, Admr.* (1939), 215 Ind. 355, 364, 19 N. E. (2d) 850:

> "A fact cannot be taken as established by undisputed evidence merely because the testimony of a witness in relation thereto is not directly controverted, where such testimony is so inconsistent

with other facts and circumstances shown by the evidence as to have little or no weight, or is so inherently improbable that it amounts to a mere conjecture."

The appellant's testimony on this point is so inconsistent with the other facts and circumstances as to have little weight. If the jury disbelieved his testimony, as it had the right to do in view of the surrounding circumstances, and believed that under the circumstances the appellant was carrying his gun in front of him, held in both hands, ready for shooting, it was reasonable to infer that, upon suddenly seeing Cook, he pointed the gun at Cook, ready to shoot if necessary. The appellant testified that the gun would not shoot until the safety was released and that he ordinarily released it when preparing to shoot. Since the gun was discharged the jury had a right to infer that the appellant automatically released the safety in getting the gun in a position where he could shoot at Cook. All of these matters might properly be considered by the jury in inferring that the appellant intentionally pointed the shotgun at Cook.

Certain conversations between the appellant and the officers who came to investigate the shooting also tend to throw light on the question of the appellant's intention. The first officer to talk with the appellant was Frank Camp, the night watchman of Fortville, who said that the appellant told him that he, the appellant, had shot a fellow; that the man he had shot was Damon Cook, and that after the shooting, the appellant had called the sheriff, who would be over in a little while. Camp testified that he said to the appellant, "Well, Dewey, are you sure you hit him?"; that Fausett said, "Well, I think I did."; and that the appellant also said, "I hit him in the stomach or in the guts. I think that is where I hit him." Price Cox, a state policeman, who

went to the appellant's home to investigate, testified that he told the appellant that Cook was in a very serious condition and that they would have to arrest the appellant; that he asked the appellant for the gun he had done the shooting with; that the appellant gave him the gun and said that it had been fired three times that night; that Cox then said to him, "Fausett, you are in a bad spot; this man is in an awful serious shape and probably will die; I hope he don't, but I am afraid he will."; that appellant said, "Yes, I know it. I don't blame you fellows at all."; and that he (Cox) replied, "You can't blame us for anything you have done." Cox testified that they then went down to the alley, to the scene of the shooting, and that there the appellant said to him, "Is Cook really hurt that bad?"; and that he (Cox) answered, "Cook is hurt awfully bad; from the information I can get down there he is going to die."; and further said, "Dewey, you are in an awful bad spot here."; to which the appellant replied, "Yes, I know it, but I told him what I would do more than once, and if you think I didn't, ask her mother." Cox then said to him, "Maybe it is all right what you told him but this thing has a bad aspect and I am sorry for you."; and the appellant answered, "I can understand that." Cox further testified that on that occasion the appellant did not say anything about any weapons Cook had, but only said, "As I went towards the car the lights were in my face. I was blinded and could not see." The above was the substance of the whole conversation which Cox had with the appellant. Both the language used by the appellant in the above conversations and the fact that he made no pretense of attempting to excuse the shooting as accidental, when talking to these officers who were investigating the shooting, is further evidence furnishing a basis for the inference that the

appellant intentionally pointed the gun at Cook. He said to the officers that he had shot Cook and that he did not think he missed him. The ordinary person would not speak of "missing" an object at which he had not intentionally pointed the gun.

Also significant was the appellant's statement, "I told him what I would do more than once." By these words appellant in effect said, "I only did what I told Cook I would do if he didn't stay away." From this answer to the officer we find no basis for inferring that appellant had done more than he intended to do. The fact that the appellant called the sheriff and the fact that after the officers told him they would have to arrest him, he said he didn't blame them, both tend to show that he realized he had violated the law.

Equally important with what the appellant said was his failure to claim that the shooting was accidental, following his admission that he had shot Cook and the officer's implied accusations that the shooting was voluntary. The officers came to his home to investigate the shooting and gave the appellant to understand that they would have to arrest him and that he was in "an awful bad spot" by reason of having shot Cook, thereby implying, of course, that appellant had intentionally shot Cook. The appellant, as a man of normal intelligence, knew that if the shooting was accidental, there would be no serious consequence to him. The natural reaction of an innocent man would have been to quickly insist that the shot was an accident; that he had not intentionally pointed the gun at Cook, nor intended to shoot him. Instead of doing this, the appellant's only excuse was that he had warned Cook. There was no testimony that on the night in question the appellant made any claim to any one that the shooting was accidental. The silence of the appel-

lant in the face of these accusations amounted to a tacit admission on his part that he intentionally pointed the gun at Cook.

In *Pierce* v. *Goldsberry* (1871), 35 Ind. 317, 321, there was an attempt to introduce evidence showing that the defendant said nothing in answer to a statement against his interest, made in his presence. The trial court excluded the evidence but this court, on appeal, held that such evidence was improperly excluded, saying, ". . . if he remained silent under such circumstances as made it his duty to speak, then such silence would have been an implied admission of the truth of the statement. . . ."

Again in *Conway* v. *The State* (1888), 118 Ind. 482, 485, 21 N. E. 285, this court said, "It is enough, to render testimony of a conversation competent, if the witnesses detail statements tending to charge the accused with the crime, and there are circumstances making it natural for him to speak, and none requiring him to remain silent."

And, as said in 20 Am. Jur. § 572, p. 485, "It is not essential that the statement assume the form of a direct charge, but may be such as would lead reasonable men similarly situated to construe it as incriminating."

In *Diamond* v. *State* (1924), 195 Ind. 285, 144 N. E. 250, 466, it was held that the mere fact that a defendant was under arrest would not make evidence of his silence inadmissible where the facts and circumstances "would naturally call for some action or reply from persons similarly situated."

Here the jury might properly have found that the statements made by the police officer to the appellant were such as to impel any reasonable person to insist on stating any facts which would tend to show that

the shooting of Cook was unintentional; that if the appellant had not even intended pointing the gun at Cook he would have made that fact known to the police who were there investigating the crime.

We believe that the evidence in this case fully sustains the finding of the jury that the appellant intentionally pointed the gun at Cook.

The judgment is affirmed.

NOTE.—Reported in 39 N. E. (2d) 728.