STATE of Maine

v.

Calvin E. TOMER.

Supreme Judicial Court of Maine.

April 30, 1973.

Michael E. Barr, Asst. Atty. Gen., Augusta, for plaintiff.

Albert H. Winchell, Jr., Bangor, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WEATHERBEE, Justice.

Tiffany Stevens, one of two 16-month-old fraternal twin daughters of Lorraine Stevens, died in Bangor, September 19, 1970 as a result of a severe beating. The Defendant, her mother's paramour, was indicted for her murder. After jury trial he was adjudged guilty of manslaughter and sentenced for that offense. He has appealed from this judgment.

The Defendant's court appointed counsel had moved for judgment of acquittal at the conclusion of the State's evidence, at the conclusion of all the evidence and again after conviction and had moved for a new trial after conviction. He urged in each instance that the evidence before the jury was insufficient to justify a conviction. On appeal the Defendant urges us that the motions for acquittal and new trial made subsequent to the completion of the testimony should have been granted and that the evidence is not sufficient to support his conviction.[1]

The jury heard evidence as to the circumstances of the child's death and the nature of her injuries which, if accepted by them, would satisfy any fair minded person beyond a reasonable doubt that she was the victim of a felonious homicide.

Is the chain of circumstances which the State presented sufficiently strong to support the jury's determination that the Defendant was the killer?

The jury could have found from the evidence that the events of Tiffany's last week of life transpired in the following manner:

Tiffany and her twin sister had been living since April in an apartment in Bangor with their unmarried mother and the Defendant. The twins were distinguishable by sight. Tiffany was a normal child in good health. Both Miss Stevens and the Defendant sporadically attended daily classes on week days under the Manpower Development Training Act. Several baby-sitters had in turn cared for the children during school hours. The Defendant was very nervous and irritable as the week started. When he was irritable, he was impatient with the children and "he would yell at them".

*Monday, September 14.*

Catherine Tomer, the Defendant's sister (whose age is not disclosed by the record), moved into the apartment to serve as baby-sitter. However, neither Miss Stevens nor the Defendant went to school on this Monday.

*Tuesday, September 15.*

Both Miss Stevens and Defendant went to school and Catherine cared for the children. For the purposes of this case, the day was uneventful.

---

1. Several other Points on Appeal originally raised have been waived.

*Wednesday, September 16.*

Miss Stevens noticed that the children were chafed and were not eating well, due to Catherine's "laziness". Both Miss Stevens and the Defendant attended school and on her return Miss Stevens found that Tiffany was vomiting in her crib. That evening both twins were in good health except for slight colds, although Tiffany did not eat much supper.

*Thursday, September 17.*

The Defendant's personality underwent a change and he was in a good mood. Miss Stevens and the Defendant stayed home from school. When Miss Stevens left the apartment for two hours in the afternoon, Catherine was still in bed. A young friend of hers, Donny Francis, about 17, and the Defendant were also in the apartment with the children. When she returned, the Defendant was already giving the children their baths. She put them to bed about 7:30 or 8 P.M. and she noticed nothing unusual about Tiffany during the day or at bedtime. She went to bed about 11 or 11:30 and the Defendant, Catherine and Donny Francis, who had been out that evening, came home sometime after that and Donny Francis stayed all night. The Defendant did not go to bed at all, as was frequently the case when he was in a good mood.

*Friday, September 18.*

Miss Stevens arose at 7 A.M. and gave the twins cookies and milk. She observed nothing unusual about Tiffany's appearance although she saw the child unclothed. She and Defendant spent the day in school, leaving Catherine and Donny Francis with the children.[2] When she returned at 3:30 or 3:45 P.M. Tiffany appeared less active than usual but not ill. Miss Stevens noticed nothing unusual about Tiffany except for a band-aid on her finger. When Donny Francis left about 5 P.M. he saw no signs that Tiffany (whom he had held in his lap) had been injured. Miss Stevens went to sleep after taking two "nerve pills". When she awoke at 6:30 P.M. the Defendant was giving the children baths. Again she noticed nothing unusual about Tiffany's appearance (but she did not see Tiffany unclothed) except that Tiffany was chilled and they wrapped her in blankets and took her into the steamy bathroom until she stopped shaking. Tiffany then seemed drowsy and appeared sick, refusing her bottle and quickly going to sleep at around 7:30. Catherine went out for the evening. The Defendant remained in the apartment with Miss Stevens.

Miss Stevens lay down on the couch, had a brief talk with a visitor, Ricky Nicolo, and then fell asleep. When she awoke at 11 P.M. Ricky was gone. She looked into the darkened bedroom (which was next to

2. Donny Francis testified that during the day Friday while he was lying on the couch he heard a "thump" in the bedroom where Catherine was attending to the children and that she had later told him that one of the twins had fallen out of its crib. He said that a week after the child's death the Defendant (who is Francis' first cousin) asked him to "help him out of it" if he could and that he told Defendant he would help him if he could. A week later he went to the police and told them of this incident. He testified, however, that the incident was not a fabrication.

Catherine *testified* that about September 23 the Defendant had asked her to tell the Court that Tiffany had fallen out of the crib. She said that on May 13, 1971, after she had testified before the Grand Jury, her brother had persuaded her to copy and sign a statement prepared by the Defendant which stated that Catherine had lied before the Grand Jury when she testified there that she had heard the Defendant slap the child and say "I hope you drop dead" and that the baby had in fact fallen out of the crib.

She testified that she had signed this statement to help her brother but that the statement was not true and that in fact she had not "dropped Tiffany". When called before the Grand Jury she had at first refused to testify but that, upon being granted immunity and upon being ordered to testify by the Court (15 M.R.S.A. § 1314-A), she had testified before the Grand Jury substantially as she had in Court.

the bedroom which she and Defendant occupied) and saw that the twins were asleep. Then she went to her bedroom and slept until 8 or 9 A.M.

Catherine returned about 11 P.M. She went out again, this time accompanied by the Defendant, to a laundromat, both returning to the apartment about an hour later.

*Saturday, September 19.*

Sometime after midnight, Saturday morning, the Defendant and Catherine went to the cellar to repair her pocketbook. They heard footsteps on the floor above the cellar but when they went up to investigate they saw no one and found the house secured. They returned to the basement and when they finished the repairs, the Defendant woke up the children, changed them and gave them some ice cream. He then took each child into the bathroom separately and washed them. Catherine saw nothing unusual about Tiffany before she went into the bathroom. While Defendant and Tiffany were in the bathroom, Tiffany was "whining" and Catherine heard "a spanking noise". The "crying noise" continued. She heard the Defendant say "I hope you drop dead."

When the Defendant brought Tiffany out of the bathroom she was "whining" and her ears were red. After being put to bed, Tiffany vomited and Catherine changed her bed. The Defendant then went to bed and Catherine went to bed 5 minutes later.

About 3:30 A.M. a Mr. Howard who occupied the apartment directly above them was awakened by a "loud bang" and "a man's voice yelling 'shut up' ". The voice came from the apartment occupied by the Defendant and Miss Stevens and was a voice that the witness had heard coming from that apartment several times before.

When Miss Stevens awoke around 8 or 9 A.M. both children were asleep. Shortly after that she heard the other twin moving about and, on going into their bedroom, she found that Tiffany was in a comatose condition. Miss Stevens, who was very distraught, noticed then only that her ears had been injured and were so discolored that the surface appeared at first to be bloody. The jury could have found that this condition of her ears was so remarkable that it would have been noticed had it existed the evening before. The child was rushed to the hospital but she expired at 10:55 A.M.

The child's injuries, as revealed by the testimony of the attending physician and the pathologist who performed an autopsy, were unusual. The outstanding feature was the appearance of her ears. The upper two thirds of each ear was bruised and excoriated with bleeding under the skin and the upper surface of the skin torn away in some areas with blood on the surface. The ears were almost reddish purple in color. These injuries could not have been suffered through natural causes or accident and resulted from the external application of a blunt shearing force against the skin. The pathologist described it as "an extraordinary combination of injuries, involving essentially the same portion of each ear".

There were also unusual injuries to the child's fingers and toes, with hemorrhage under eight toe nails and eight finger nails. The pathologist agreed it appeared as it would if one had hit his hand or thumb with a hammer. A toe nail on each foot had been separated half way from the nail bed and underneath the nail the area was deep red. These could not have been caused accidentally. A similar avulsion was present on one finger.[3]

3. A perplexing aspect of the case is that the pathologist testified that the avulsion of the finger was covered by a band-aid and Miss Stevens remembered seeing a band-aid on one of the child's fingers for the first time when Miss Stevens came home from school Friday afternoon. This would suggest that the injury to the finger may have occurred while the child was with Donny Francis and Catherine. Catherine, however, testified that she did not see a band-aid on the child's finger. The

There were recent (within 48 hours) broad scratch marks in the left armpit and on the left cheek[4] and a 2½ inch scratch on one foot and several small scratches on the sole of the other foot. There were contusions on her scalp. The abdomen was very bloated and there was a bruise 1″ in diameter on the abdomen.

When the distended abdomen was opened it was discovered that there was a "fairly large" rupture of the jejunum. The rupture had resulted from the application of blunt external force. The rupture of the jejunum had permitted the contents of the intestine to enter the peritoneal cavity, seeding it with bacteria, causing peritonitis and ultimate death.

The substance of the medical testimony was that the force which had ruptured the jejunum had been suffered during a period of between 36 and 6 hours of death and that the scratches in the armpit and on the cheek probably occurred within 24 hours of death. There was evidence that the injuries to the ears could have been inflicted between 48 and 12 hours of death. The jury also saw and could evaluate slides showing injuries to the child's head and body.

■ The evaluation of the creditability of the witnesses was within the province of the jury. State v. Trask, Me., 223 A.2d 823 (1966).

The jury had heard evidence from which they could conclude that Tiffany showed no visible injuries to her ears, fingers,[5] toes or face when her mother put her to bed at around 7:30 Friday evening or when Catherine saw the Defendant take the child into the bathroom sometime after midnight (except that Catherine had seen a scratch on her face at one time but couldn't remember which day).

The jury could conclude that the Defendant had struck the child in the bathroom and had said "I hope you drop dead" and that Tiffany cried. When they came out, Tiffany's ears were red, a condition which had not been present before and which the jury could conclude had resulted from mistreatment by the Defendant. A few moments later she vomited. From then until about 9 A.M. Catherine and Miss Stevens were asleep. About 3:30 A.M. the occupant of the apartment above heard a "loud bang" from Miss Stevens' apartment and "a man's voice yelling 'shut up'". It was a voice the witness had heard coming from that apartment several times before. The jury would have been justified in inferring that it was the Defendant's voice and that it accompanied further violence upon the child. The jury could properly have concluded that the Defendant had injured the child's ears during the incident in the bathroom and that the same motivation which had impelled him to do her those brutal injuries had resulted in his striking her in the abdomen—either then or later when the other disturbance awakened Mr. Howard—rupturing her jejunum and causing her death somewhat more than six hours later.

The jury could well have found that this chain of circumstances, each proved beyond a reasonable doubt, led inexorably to the conclusion that the little girl's death was a felonious homicide and that the Defendant was the guilty party.

Other hypotheses could be advanced to explain Tiffany's death—such as that she was assaulted by an unknown intruder who had gained entrance to the apartment while the Defendant and Catherine were in the

pathologist said this injury could have been caused accidentally. The comparative credibility and accuracy of memory of these witnesses concerning this aspect of the case—and its significance—were matters for evaluation by the jury.

4. Catherine Tomer remembered seeing "a scratch" on the child's cheek but couldn't remember on which day she had observed it. On the other hand, Miss Stevens observed that week only a "little bite mark" where the other twin had bitten Tiffany's cheek.

5. Note, however, the probable exception of the injury to the band-aid covered finger discussed in footnote 3.

cellar or by one of the two people other than the Defendant who spent Friday night in the apartment or by one or another of the earlier visitors or that she had fallen from her crib—but the jury evidently found each of these hypotheses to have been unreasonable and unsatisfactory attempts to explain her injuries. We cannot say that the jury was not justified in rejecting them and in accepting the hypotheses that led them to convict Defendant of manslaughter.

 The Defendant abandoned his motion for judgment of acquittal by offering testimony in defense. State v. Rowe, Me., 238 A.2d 217, 220 (1968). His motions for judgment of acquittal at the conclusion of all the evidence and after conviction and for a new trial raise identical questions—the sufficiency of the evidence to warrant belief of the Defendant's guilt beyond a reasonable doubt. State v. O'Clair, Me., 292 A.2d 186, 196 (1972). The evidence was sufficient to justify conviction and there was no error in the Justice's denial of the Defendant's motions.[6]

The entry must be:

Appeal denied.

6. The Presiding Justice carefully and thoroughly instructed the jury as to the manner in which the evidence may be evaluated and tested against the necessity that guilt be proved beyond a reasonable doubt. As part of his explanation of their appraisal of circumstantial evidence the Justice made use of language which has been given to juries by our Courts for many years and which followed verbatim the test as described by this Court in State v. Allen, 151 Me. 486, 489, 121 A.2d 342, 345 (1956):

"... It must prove each and every circumstance upon which the conviction must rest beyond a reasonable doubt *and the evidence must be sufficient to exclude every other reasonable hypothesis except that of the respondent's guilt.* ..." (Emphasis added.)

The use of the emphasized language has been severely criticized in the federal system since it was branded by Judge Learned Hand as

"... [A] refinement which only serves to confuse laymen into supposing that they should use circumstantial evidence otherwise than testimonial." United States v. Becker, 62 F.2d 1007, 1010 (2nd Cir. 1933).

In Holland v. United States, 348 U.S. 121, 139–140, 75 S.Ct. 127, 137, 99 L.Ed. 150, 166 (1954) the United States Supreme Court upheld the refusal of the trial Judge to charge that where the Government's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other than that of guilt. The Court said:

"There is some support for this type of instruction in the lower court decisions, ... but the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect, ....

Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more." (Citations omitted.)

The belief that this language appears to create, erroneously, a special rule concerning sufficiency of the evidence in circumstantial evidence cases has led the federal Circuit Courts to disapprove of the use of this "inexorable ritual" (United States v. Becker, supra). United States v. Currier, 454 F.2d 835 (1st Cir. 1972), and cases cited therein; 2 C. Wright, Federal Practice and Procedure, § 467 (1969). But see United States v. Sutherland, 463 F.2d 641 (5th Cir. 1972), where the Judges of the Fifth Circuit have rephrased rather than rejected altogether the traditional language.

In Henry v. State, Del.Supr., 298 A.2d 327 (1973) the Delaware Supreme Court announced its rejection of reliance upon the language disapproved in *Holland.*

In the present case no objection was made to the use of this familiar language. M.R.Crim.P.Rule 30(b). The Justice's painstaking and complete explanation as to the use of all evidence removed any possibility that the use of the language just discussed could have been manifest error, prejudicial to the Defendant. State v. McKeough, Me., 300 A.2d 755 (1973).