**STATE of Maine**

**v.**

**Lloyd Wayne NORTHUP.**

Supreme Judicial Court of Maine.

April 5, 1974.

John R. Atwood, Charles K. Leadbetter, Asst. Attys. Gen., Augusta, for plaintiff.

Wathen/Wathen by Daniel E. Wathen, Augusta, for defendant.

Before DUFRESNE, C., J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WEATHERBEE, Justice.

While at her South Gardiner home on the night of August 18, 1972, Mrs. Gloria Gough received a phone call at 10:00 p. m. She immediately put on her rain gear and drove off in her green Volkswagen car.

Sometime after 9:00 p. m. that night the Defendant escaped from the Kennebec County jail.

In the early evening of August 22, 1972, two officers from the Gardiner Police Department found the partially decomposed body of a woman lying in a wooded area of South Gardiner. The body was later authoritatively identified as that of Gloria Gough, who had been missing since that night of August 18.

An autopsy performed soon afterward revealed a chest wound about one half inch wide extending directly through the victim's heart. A wire had been tied around the neck of the victim. Death was caused by the stab wound and resultant bleeding of the heart.

Also on the night of August 22, the Defendant Northup was arrested in Portland on a federal fugitive from justice warrant which had issued as a result of an alleged murder in South Carolina. He later was charged with the murder of Gloria Gough. Northup was indicted by the Kennebec County grand jury and on December 9, 1972 was convicted by a jury of murder.

The Defendant has appealed his conviction to this Court. We deny his appeal. The Defendant asserts several grounds for reversal, and we will review each one in turn.

*1. The Trial Justice's denial of the Defendant's motion for a change of venue*

■ Prior to trial the Defendant moved for a change of venue based on his claim that pre-trial publicity was prejudicial to his case. This motion was denied by the Trial Justice. The Defendant now claims that this denial was an abuse of discretion. We do not agree.

In support of his contention, the Defendant offered an affidavit and exhibits consisting of three copies of the Daily Kennebec Journal, a mass circulation paper published in Augusta. Each copy contains a front page story dealing with the case at bar.

The first issue, dated August 24, 1972, exhibits the following headline: "Local man hospitalized, linked with murders in two states." A picture of the Defendant and an identifying caption appear next to the headline. The news story states that Northup was arrested for a murder in South Carolina and was wanted for questioning in regard to the murder of Gloria Gough. The article relates Northup's prior convictions for rape and sodomy, his escape from the county jail, and his reputation as a model prisoner while serving as cook at that jail. The story also mentions some details of the Gough murder and speculation about Northup's alleged connection with it. Continued to page two of the paper, the article follows a headline on that page stating: "Northup linked with two murders."

The second edition of the paper, dated September 6, 1972, contains three stories, all dealing with the possible lack of security at the county jail. Two of the three mention the escape from jail of Northup and his suspected involvement in the Gough murder. The thrust of the articles is directed to the condition of the jail and not the murder of Mrs. Gough.

The third copy from September 7, 1972, focuses on the local sheriff's plea for an investigation of any wrong-doing at the jail. Northup is again mentioned as the recent escapee from the jail who was charged with one murder and was questioned about the Gough case.

A portion of the record of voir dire is before us on appeal. The Defendant does not contend that the record discloses any prejudice on the part of the jurors who

participated in the Defendant's trial and we ourselves find none. The Justice raised the issue of publicity before the prospective jurors and asked if any had heard or read any reports dealing with the incident. Sixteen answered that they had heard or read about the case. The Justice asked these sixteen if this familiarity with the news coverage of the case would influence their judgments if they were chosen as jurors. Three prospective jurors answered that they would be influenced by the information they had gained through the news media and the Justice ruled that they could not sit as jurors.

All in all, the record shows that the Justice acted carefully and competently to insure that no biased juror would sit.

The Defendant contends, however, that the extent and nature of the pretrial publicity was such as to instill in the minds of the jurors, subconsciously, at least, an inclination toward belief in the Defendant's guilt, which would harden into prejudice as some of the unusual details of the case unfolded. He urges us that the fact that although only sixteen out of the "less than 100" prospective jurors admitted having heard or read about the case, it is probable that others had recalled the publicity relating to the escape or murder upon hearing the testimony during trial.

We are not satisfied that such a danger was present. The news stories appear to be factual and somewhat restrained accounts of the escape and of Mrs. Gough's death. They did not constitute such inflammatory or slanted reporting as might infest the community with a belief in the Defendant's guilt and make impossible the selection of an impartial jury in Kennebec County. The record does not suggest that the newspaper's vague reference to another murder in another state made a prejudicial impression upon the jurors. We believe that the careful voir dire and the Justice's clear instructions as to the necessity that their verdict be based on legal evidence presented to them, free from preconceived

ideas as to the facts or law, was adequate to assure that the jury was impartial.

This Court extensively discussed the question of pretrial publicity in State v. Coty, Me., 229 A.2d 205 (1967) and affirmed those principles generally in State v. Berube, Me., 297 A.2d 884 (1972), State v. Collins, Me., 297 A.2d 620 (1972), and State v. Stoddard, Me., 289 A.2d 33 (1972). In viewing the quality and quantity of news stories and the subsequent safeguards employed by the Justice, we cannot say that the Justice abused his discretion or that the selected jury was partial so as to preclude a fair trial.

*2. The admission into evidence of two statements made by the Defendant in conversations with the sheriff and a detective*

The Defendant claims error because the Trial Justice admitted into evidence two similar statements spoken by the Defendant while he was in the Portland jail on August 25, 1972. At that time the Defendant had been arrested on the federal fugitive from justice warrant as a result of the South Carolina death and was not charged with the Gough murder. However, Sheriff Jordan from Augusta and·a state police officer were anxious to talk to Northup about his break from jail a week earlier and his possible involvement in the murder of Mrs. Gough.

In the early afternoon of August 25, Sheriff Jordan spoke with the Defendant in a room at the jail. The sheriff fully advised Northup of his rights and Northup indicated he wished to talk. The sheriff asked two questions concerning Northup's escape and theft of the sheriff's gun from the sheriff's home, to which Northup responded. Then, according to Sheriff Jordan, Northup volunteered a statement:

"Well, as I got ready to leave, he stated that he would probably plead to Gloria's rather than going back down south, or returning to the south, something to that effect."

About 6:00 p. m. the same day, State Police Detective Greeley talked to the Defendant at the jail pursuant to the Defendant's request. Greeley warned Northup of his Miranda rights, and Northup proceeded to ask the detective a few questions. Greeley testified that "[h]e asked me if he admitted to the murder in Gardiner would the authorities in South Carolina be still looking for him."

The Defendant asserts that the admission into evidence of these two statements was incorrect because the material was 1) irrelevant and 2) highly prejudicial and suggestive of his involvement in another crime.

■ We disagree. Relevancy is a threshold test of evidence admissibility in our legal system. We stated in State v. Graves, Me., 224 A.2d 57, 60 (1966) that relevant evidence is that which relates logically to the issue. Evidence is relevant if it has probative value in establishing or negating a fact or issue at hand. *See* State v. Eaton, Me., 309 A.2d 334 (1973); Rules of Evidence for United States Courts and Magistrates, Rule 401 (effective date deferred). This Court has recognized that the determination of evidence relevancy is within the discretionary power of the trial Justice and will not be overturned absent an abuse of this discretion. Torrey v. Congress Square Hotel Co., 145 Me. 234, 75 A.2d 451 (1950).

■ The two statements under consideration are admissible to show knowledge by Northup of the death of Gloria Gough, indicating his possible involvement in the murder. The evidentiary value of the statements rests solely on the fact they were said and not on the truth of their contents; thus, they are not hearsay.[1] The statements were volunteered by the Defendant at two times on August 25, and were unrelated to the conversa-

tions taking place each time. Evidence showed that Northup had returned from the South by bus on the 22nd and was arrested that night by the F.B.I. and Portland police soon after he left the bus. Gloria Gough's body was discovered on the evening of August 22. Since that time the Defendant had been in custody either in a hospital or in jail in Portland. He did talk to his attorney and made an appearance before a federal magistrate on the 24th.

■ We do not require the prosecution to demonstrate that only through his own knowledge could Northup have been aware of the Gough murder on August 25, 1972. It is for the jury to weigh the evidence and decide what value should be placed on Northup's statements. He was being detained for the South Carolina authorities and counsel had been retained or appointed for him on that charge. There was no testimony indicating that he had been informed as to Mrs. Gough's death or that he was suspected of involvement in it. The circumstances do suggest that it was quite possible that Northup made the statements indicating his knowledge of the murder because he had been present when Mrs. Gough was killed. Surely, this is a relevant area of inquiry for the jurors who must establish the facts in the case. Relevant evidence is not required to be excluded merely because it suggests a Defendant's involvement in a crime other than the one on which he is being tried. *See* State v. Smith, Me., 277 A.2d 481, 491 (1971).

■ Relevant evidence may nevertheless be excluded if, for one reason, it is too prejudicial in contrast to its probative value. 1 J. Wigmore, Evidence § 29a (3d ed. 1940). The statements made here did convey an impression that the Defendant was involved in some criminal activity in South Carolina. His presence in that state was also the subject of an eyewitness'

---

1. We do not concern ourselves with the Defendant's assertion that the statements are improper admissions, for we are not dealing with hearsay evidence.

testimony, though no mention was ever made before the jury that he was sought for a specific crime. The whereabouts of Northup between his escape from jail and his reappearance in Maine four days later was properly an issue before the jury. We feel the Trial Justice did not abuse his discretion in admitting the two statements despite their vague references to other criminal conduct for which Northup was not on trial. Probative value outweighed any prejudice in both instances.

### 3. The admission into evidence of testimony of Monette Reagan

■ The Defendant also urges that the Trial Justice erred when he admitted into evidence Monette Reagan's testimony concerning a talk between her and Northup on one of her visits to the jail. Mrs. Reagan stated that on an August Sunday prior to the Defendant's escape from jail Northup asked her to meet him "at midnight Saturday" with an automobile. He stated that he was "getting out" and would like to see her.

The Defendant objected at trial and still claims that the above statements are irrelevant and therefore inadmissible. Relying on the standard for relevancy previously mentioned above, we find no merit in his contention.

The admitted evidence has probative value in establishing that Northup intended to break out of jail late on a forthcoming Saturday night, that he sought the company of a woman for that occasion, and that he wished the use of a car. While Mrs. Reagan did not meet Northup, other evidence suggests that Mrs. Gough may have driven her car to meet the Defendant on the Saturday night he escaped from jail. All of this is relevant in establishing that Northup could have been the murderer of Mrs. Gough. Again, there was no abuse of discretion.

### 4. The Trial Justice's denial of the Defendant's motion for a mistrial

During his opening statement to the jury, the prosecutor stated that the State would reveal that the police found in the victim's car "a list of names with Gloria Gough's name at the top and telephone numbers. The rest of the names on the list were all acquaintances of Wayne Northup's." As the evidence unfolded, the State demonstrated persuasively that Mrs. Gough was known to the Defendant. Evidence seeking to link other names on the list—such as those of the sheriff's daughter and of a lady deputy sheriff—to the Defendant was less convincing. The State did offer testimony which showed that the list containing these names was found in a pair of dungarees claimed to belong to Northup.

Twice during the trial the defense moved for a mistrial, alleging that the list of eight names had not been tied to Northup and that its admission into evidence allowed the jurors to infer that Northup wrote the list.

As we have noted several times, a trial Justice's failure to grant a mistrial will be deemed improper only if the Justice abuses his discretion. E. g., State v. Hachey, Me., 278 A.2d 397 (1971); State v. Hamilton, 149 Me. 218, 100 A.2d 234 (1953). We find no abuse in the case at bar.

■ In his opening remarks the prosecuting attorney hopes to set the stage for evidence later to be developed. He is merely seeking to focus the jurors' attention on certain key facts which the State will show. He, of course, has a duty to act in good faith and with reasonable effort to produce the evidence at trial which he has previously mentioned while opening. In an instance where the evidence never proven is actually crucial, there is the possibility that the jury could be so influenced by its mention in the opening statement that constitutional error could result. Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

■ Neither prosecutional bad faith nor prejudice is present in the record before us. The Trial Justice clearly told the jury

that remarks of the attorneys were not to be considered as evidence. He noted: "The evidence itself will be by way of sworn testimony of the witnesses that appear upon the witness stand." The prosecution did produce evidence to show that the list of eight names was found in trousers asserted to belong to Northup, that Northup knew Gloria Gough, that her name was at the top of the list, and that several of the other names may inferentially have been known to Northup. We do not believe that the prosecution's admitted failure to link the Defendant to all or even most of the names on the list was prejudicial to the Defendant. The essential task, that of linking Northup to Gloria Gough, was accomplished by the State.

■ Another name on the list found in the victim's car was that of M___ B___. An officer testified that M___ B___ was a lady who lived alone and who had "harbored two escaped prisoners in the past". On cross-examination, the officer said that this lady had not been convicted of harboring escapees.

At side bar, defense counsel moved for a mistrial asserting that it "had been the intention to introduce hearsay with no evidence to support what they said".

The Justice denied the motion. While the record does not disclose whether the officer's information as to her harboring escapees in the past was gained from his inquiries or his own observation, the Justice apparently assumed the statement was hearsay and, in the absence of contradiction by the State, we make the same assumption.

The Justice immediately instructed the jury to disregard the testimony as to M___ B___ entirely, assuring them that "it has no bearing at all in this case". The Presiding Justice, who was in a position to evaluate the impact of this testimony upon the jury, was satisfied that his prompt curative instruction removed any prejudicial effect of this testimony. We do not find that his denial of the motion for mistrial was an abuse of his discretion. Our examination of the offending answer against the background of the entire record satisfies us that the Justice was correct in deciding that the danger of prejudice could be avoided by his instruction.

## 5. The sufficiency of the evidence

■ Additionally, the Defendant urges on appeal that the evidence presented at trial is not sufficient to support the jury verdict of guilty of murder. This issue is properly before us because the Defendant made a motion for judgment of acquittal under M.R.Crim.P., Rule 29(a) following the close of all the evidence.

In viewing the sufficiency of the evidence on appeal, we must determine if a jury could reasonably find the Defendant guilty of murder based on the evidence presented. *E. g.,* State v. Tomer, Me., 304 A.2d 80 (1973).

The State's position rests on circumstantial evidence. The defense maintains that the State has failed to prove beyond a reasonable doubt that the Defendant unlawfully killed Mrs. Gough because other reasonable hypotheses explaining her death still exist. It is *not* the State's burden to disprove every possible manner in which the victim's death could have resulted. The State need not recount each detail of the killing, nor must it account for all the Defendant's actions between his jail break and arrest. Instead, the State must, as in every trial, present evidence at trial which convinces the jury of the Defendant's guilt beyond a reasonable doubt. The State's burden of persuasion remains the same, whether it relies upon direct evidence, circumstantial evidence, or a combination of both. *See* State v. Tomer, supra, at 85 n. 6.

After reviewing the record, we believe that the jury was warranted in finding, beyond a reasonable doubt, that Northup murdered the deceased. We do not deem it necessary to relate all the evidence which

could support the jury verdict, but we will present the framework of the State's case.

The jury could find that sometime after 9 o'clock on the night of August 18 and before the following morning, after planning for sometime to escape, the Defendant did break jail in Augusta. Evidence showed that Northup knew Gloria Gough, who was a friend of the sheriff and his wife, from her visits to the county jail and had been seen talking with her several times.

Evidence also supported a finding that the sheriff's home in Gardiner was burglarized that same night, resulting in a missing revolver and spool of wire. The Defendant had previously been to the sheriff's house and had frequently worked there in the sheriff's garden where vegetables for jail use were raised. Thus, he was aware of the home's location.

The jury could likewise find that Gloria Gough received a call at 10:00 p. m. on the night of August 18, 1972, and left in her car thereafter.

Mrs. Gough's stabbed body was found on August 22, with the time of death placed at four to five days before. Her clothing was the same as on the night of August 18, and wire, similar in every detail of its composition to that taken from the sheriff's house, was tied around her neck.

The Defendant was seen by his sister on August 20 in Fayetteville, North Carolina, driving a green Volkswagen—the same color and make car as that owned by Gloria Gough. He was next observed that night in South Carolina, fleeing from a home, apparently uninjured at that time. Mrs. Gough's green Volkswagen was left standing in the driveway of the same home and was searched by police. The car contained many items, including blood-stained towels similar to those used in the kitchen of the Augusta jail, on one of which was a head hair with microscopic similarity to those of the deceased, other head hairs similar to the deceased's, the purse, house key, business key and several personal items belonging to Mrs. Gough, and a list of names with the victim's on top. A radio belonging to Northup, a "C.P.O." jacket similar to one known to have been owned by Northup, and a map on which the city of Fayetteville, North Carolina (his sister's residence) was circled were also discovered in the car. Police also determined that Northup's fingerprints were on the inside of the car.

When the Defendant returned briefly to his sister's home in North Carolina on August 21, he was without the green Volkswagen and was bleeding from a leg wound which he had not had the day before. At this time his sister put him on a bus for Portland. When arrested on the federal warrant on the night of August 22, Northup had in his possession a map on which the town of Mount Pleasant, South Carolina was circled. This was the town where Northup had earlier been observed running from a home.

All this evidence, though circumstantial, was abundantly adequate, with the medical testimony, to warrant a jury in believing that the Defendant murdered Mrs. Gough.

*6. The omission by the Trial Justice of a jury instruction on involuntary manslaughter*

The Defendant's sixth point urges that we must find obvious error under M.R. Crim.P., Rule 52(b) occasioned by the Justice's failure to give an instruction which would place the issue of involuntary or common law manslaughter before the jury.

The Presiding Justice instructed the jurors that they were to determine whether the State had proved that the Defendant had unlawfully killed Mrs. Gough and he explained the elements which they should consider in determining whether a felonious homicide was punishable as murder or manslaughter. His explanation of manslaughter, however, was confined to the

elements of *voluntary* manslaughter and he made no specific mention of *involuntary* manslaughter to which our statute refers as "manslaughter as defined by the common law".[2]

Our statutes make the crime of felonious homicide a single generic offense and violations are punishable as murder or manslaughter as they are found to comport with statutory and decisional dimensions. *E. g.*, State v. Lafferty, Me., 309 A.2d 647 (1973); State v. Rollins, Me., 295 A.2d 914 (1972); State v. Wilbur, Me., 278 A.2d 139 (1971). As long ago as in State v. Conley, 39 Me. 78 (1854) this Court recognized that manslaughter under the common law included both voluntary and involuntary killings and that both were encompassed in our statutory definition of manslaughter, the language of which has changed little to this date (except for the addition in 1905 of the provision concerning the failure to provide necessaries of life). The Court said in *Conley*:[3]

"When a party is charged in an indictment with the crime of murder, the felony actually committed is the same, whether it has all the elements of murder in the first or second degree, or whether it is wanting in the criterion of murder, and is therefore manslaughter only. The two lower degrees of felonious homicide are embraced in the charge of the higher offence, and a conviction of either of the three, or an acquittal under the charge properly made, is a bar to any other indictment for the same acts." 39 Me. at 88–89.

An involuntary killing—that is, one in which an intent to kill could not be found expressly or by implication, but to which the common law attached criminality—is a homicide which "was either due to a reckless disregard of the safety of others, or that, if it resulted while in the performance of an unlawful act and involuntary, the unlawful act was *malum in se,* or, if *malum prohibitum,* that it was at least the proximate cause of the homicide." State v. Budge, 126 Me. 223, 225, 137 A. 244, 245–246 (1927). *Cf.* 1 Wharton's Criminal Law and Procedure § 289 (R. Anderson rev. ed. 1957). Additionally, *see e. g.,* State v. Hamilton, 149 Me. 218, 100 A.2d 234 (1953); State v. Pond, 125 Me. 453, 134 A. 572 (1926); State v. Smith, 65 Me. 257 (1876); Smith v. State, 33 Me. 48 (1851).

We feel that our legislative concept of a single underlying criminal entity of felonious homicide necessitates a determination by the jury, at one trial, whether the killing was made unlawful either by the existence of an intent to take life, either express or implied (in which case the jury will determine whether the offense falls into the punishment category of murder or manslaughter) or by conduct which, although death is not intended either expressly or by legal implication, was recognized as criminal and as constituting manslaughter under the common law (in which case it also is punishable as manslaughter by statute).

While it cannot logically be said that involuntary or unintended homicide is a

---

2. 17 M.R.S.A. § 2551:
"Whoever unlawfully kills a human being in the heat of passion, on sudden provocation, without express or implied malice aforethought, or, being under the legal duty to care and provide for any child or other person, willfully fails or neglects to provide for such a child or other person necessary food, clothing, treatment for the sick or other necessaries of life, thereby causing or hastening the death of such child or other person, *or commits manslaughter as defined by the common law,* shall be punished by a fine of

not more than $1,000 or by imprisonment for not more than 20 years, except that if there is violation of Title 29, sections 1315 or 1316, no prosecution for manslaughter shall lie." (Emphasis added.)

3. In 1854 our statutes divided murder into two degrees those of the first degree consisting of felonious homicides which were expressly intended (and certain felony murders) and those in the second degree including all other unlawful homicides above the degree of manslaughter. R.S.1840, ch. 154, §§ 1, 2 and 3.

lesser offense necessarily included in a charge of murder (as we defined the principle of lesser included offenses in State v. Leeman, Me., 291 A.2d 709 (1972)) it is contained by statutory definition in the generic offense of felonious homicide.[4] Inasmuch as the offense of felonious homicide includes involuntary (but still unlawful) killings as well as intentional killings the jury should determine, in one trial, all aspects of the State's charge that the Defendant unlawfully killed the victim. The Justice's charge should have contained an explanation of the elements of involuntary manslaughter.

■ The State contends here that in this particular case, at least, there was no evidence from which the jury could have concluded that this was an involuntary killing and that, therefore, the Justice was not required to give an involuntary manslaughter instruction. We realize that we said in State v. Park, 159 Me. 328, 193 A.2d 1 (1963) that an instruction on manslaughter is not required where there was an absence of evidence from which the jury could have found that the killing resulted from heat of passion upon adequate, sudden provocation. In Park, however, the Court was speaking of the situation in which the jury had found that an unlawful intentional homicide had been proved by the State. At this point, all the elements of the crime of felonious homicide have been established by the State and, nothing else appearing, the crime is punishable as murder. If, however, there has been evidence produced which convinces the jury that the Defendant's wrongful intentional conduct was produced by heat of passion, upon adequate, sudden provocation, the blameworthiness is palliated and the felonious homicide is punishable as voluntary manslaughter. The presence or absence of heat of passion, upon adequate sudden provocation, does not determine the criminality of the act and its presence or absence is no part of the State's burden of proof as to the commission of the crime of felonious homicide. Therefore, if evidence as to this potentially palliating factor is completely absent (as it was in Park) the jury has no need for instruction as to voluntary manslaughter.

■ The situation is entirely different as to the necessity for instruction as to involuntary manslaughter. The manner in which the jury finds that the killing was committed determines its unlawfulness (if it was unlawful) and the jury may find that it was unlawful because it was an unjustified and unexcused intentional killing or that it was unlawful because it was within the criminality category of proscribed involuntary killings. There is no crime until the State has proved one of the elements which makes the killing unlawful and the issue of how death was caused should be submitted to the jury with instruction as to the nature of both voluntary and involuntary homicides.[5] The Defendant would have been entitled to an instruction on involuntary manslaughter if he had requested it.

4. We note that the Indiana Court, although conceding the somewhat imperfect reasoning of a principle which holds a lesser, involuntary offense to be included in a more serious voluntary offense, is satisfied that, as to unlawful killing, there are no policy considerations which oppose the continuation of their long acceptance of the principle that all grades of felonious homicide including involuntary manslaughter, are included in a charge of murder. Mimms v. State, 249 Ind. 168, 231 N.E.2d 151 (1967) ; Fausett v. State, 219 Ind. 500, 504, 39 N.E.2d 728, 730 (1942).

5. This Court recognized in State v. Verrill, 54 Me. 408 (1867) and in Thompson, Ptr., 141 Me. 250, 42 A.2d 900 (1945) that there are several other statutes declaring felonious certain conduct resulting in death and punishing ·it as manslaughter and which could not be charged under the statutory abbreviated form for murder and manslaughter. 17 M.R.S.A. § 751. We have not concerned ourselves in this discussion with such special statutory offenses involving deaths resulting from negligence in handling steam boilers or boats (17 M.R.S.A. § 2552), with reckless homicides (29 M.R.S.A. § 1315), or with deaths alleged to have resulted from operation of a motor vehicle based on unlawful acts not necessarily required to establish the crime of reckless homicide (State v. London, 156 Me. 123, 162 A.2d

The Justice did not submit the question of involuntary manslaughter for the jury's consideration. The Defendant made no request for an instruction on involuntary manslaughter and did not object to the Justice's charge as given.[6] He was content to have the case submitted to the jury on instructions that he was to be found not guilty unless the State had proved an intentional killing—until after he had been convicted. Therefore, as we held in State v. Collins, Me., 297 A.2d 620 (1972) and more recently in State v. Pratt, Me., 309 A.2d 864 (1973) and in State v. McKeough, Me., 300 A.2d 755 (1973), this present claim of error is cognizable on appeal only if the error is "obvious" and "affecting substantial rights".[7] We held in State v. Langley, Me., 242 A.2d 688, 690 (1968) that such claims of error cannot be raised for the first time on appeal except

> "when the error complained of is so highly prejudicial and so taints the proceeding as virtually to deprive the aggrieved party of a fair trial."

The Defendant, having failed to request an instruction on involuntary manslaughter or to make timely objection to the charge as given, must now, as appellant, satisfy this Court (by a fair preponderance) that the Justice's failure to give the instruction resulted in manifest injustice such as virtually to deprive the Defendant of a fair trial. To decide this issue we must first consider the entire record and determine the probable effect of the failure to give the instruction in the light of all the evidence. *See* Johnson v. United States, 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704, 714 (1943) (Frankfurter, J. concurring).

Although the Presiding Justice did not explain to the jury the elements of involuntary manslaughter he made clear to the jurors that they could not find the Defendant guilty of felonious homicide in the penalty degree of either murder or manslaughter if they found that the killing was accidental or otherwise unintended. He instructed the jury that they could find the Defendant guilty only if there was "a clear and deliberate intent to take a life" or "a real desire and purpose to kill, but in the heat of passion". Otherwise, he was to be found not guilty. In one sense, surely, instruction that the Defendant should be found guilty only if the jury determined that the killing was an intentional homicide was more favorable to the Defendant than was deserved. In effect, the jury was instructed that if the Defendant was found to have killed Mrs. Gough *involuntarily,* he should be found *not guilty.* The Defendant reminds us, however, that if the jury had been instructed on involuntary manslaughter the jurors could conceivably have returned a verdict of manslaughter based on a finding of an unintended killing, instead of one of murder.

The State presented no testimony of eyewitnesses to the killing and the jurors heard no testimony from the Defendant or from witnesses repeating out-of-court statements of the Defendant relating to Mrs. Gough's death. They were required to determine by inference, if they could, whether the killing was intentional or not from the known circumstances surrounding her death. Those circumstances included the facts that a blade had been driven with great force into Mrs. Gough's heart to a depth of 4½ to 5 inches and

---

150 (1960)) which are punishable as manslaughter, (or with deaths resulting from unlawful acts to railroad property (17 M.R.S.A. § 2652) which are punishable as murder).

6. M.R.Crim.P., Rule 30(b):
    "No party shall assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinct-

ly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing and presence of the jury."

7. M.R.Crim.P., Rule 52(b):
    "Obvious errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

that a length of insulated electric wire had been tied around her throat tightly enough so that a band of hemorrhage in the larynx of the badly decomposed body was visible at the time of the autopsy. The Defendant has not satisfied us that manifest injustice resulted from the absence of an involuntary manslaughter instruction. In fact, we see no reasonable possibility that the jury, if so instructed, would have found that the killing of Mrs. Gough was unintended.

*7. The Trial Justice's denial of the Defendant's motion for a new trial*

▪ Two weeks after the verdict was rendered, a hearing on this motion for new trial was held by the Trial Justice. The Defendant claimed that certain jury members acted improperly shortly after returning the verdict in the case. Following the testimony of two witnesses, called by the Defendant, the Justice denied the motion.

The alleged impropriety arose from the following circumstances. Prior to trial a local State Representative had been publicly protesting the lack of security afforded by the county jail in Augusta. This outcry was apparently triggered by the escape of Northup. The three editions of the daily paper which were admitted into evidence on the motion for change of venue mentioned this Representative and the issue of jail security. This same Representative happened to be in the courtroom when the jury returned with its verdict. After the jurors had returned their verdict, had been excused and had returned to their jury room where some were putting on their coats preparatory to leaving for their homes, the foreman of the jury beckoned the Representative to come into the jury room. He did so and the foreman told him the jurors felt, as citizens, that there was a serious security problem at the jail and that they believed that the Legislature should investigate the situation. At the hearing both the foreman and the Representative denied they had any discussion about the Northup murder case.

Granting or denying a motion for a new trial is within the discretion of the trial Justice. *See* Bodwell-Leighton Co. v. Coffin & Wimple, Inc., 144 Me. 367, 69 A.2d 567 (1949). We find no abuse of discretion in the present case.

Evidence presented at the hearing did not show even a hint of conduct by jurors or anyone else which demonstrated prejudice on the jurors' part. The jurors spoke as concerned citizens to the Representative *after* they had fulfilled their duties and had been excused. This evidence falls far short of that point at which prejudice of the Defendant might arise from jury misconduct or partiality. Portions of the voir dire examination of the jury foreman show that the question of his prior knowledge of the Northup case was adequately covered at that time.

The entry will be:

Appeal denied.