**STATE of Maine**

**v.**

**Norman ELLIS.**

Supreme Judicial Court of Maine.

Oct. 3, 1974.

Foahd J. Saliem, Charles K. Leadbetter, Asst. Attys. Gen., Augusta, for plaintiff.

Vafiades, Brountas & Kominsky, by Lewis V. Vafiades, Susan R. Kominsky, Bangor, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

POMEROY, Justice.

Two Penobscot County juries, after hearing evidence, have declared that Norman Ellis caused the death of Meredith A. LaBree by shooting her under such circumstances that the crime he so committed is punishable as "murder."

The first judgment of guilty entered on the jury verdict was set aside on November 20, 1972, when we sustained the defendant's appeal and ordered a new trial. State v. Ellis, Me., 297 A.2d 91 (1972).

A retrial was commenced February 5, 1973.

As in the earlier trial, a guilty verdict resulted.

From a judgment entered on this verdict the defendant has appealed.

Once again we must sustain the appeal.

Upon reviewing the first trial of Ellis, we found it to be fatally defective because inadmissible, prejudicial evidence was presented to the jury for its consideration over the objection of the then defendant.

We find the conviction now under review must be set aside and new trial ordered because the jury was denied an instruction as to "involuntary manslaughter."

It is undisputed that appellant Ellis and the shooting victim, Meredith LaBree, had lived in the same house with Mrs. LaBree's mother and the LaBree children for about four and one-half months prior to the killing on July 8, 1970.

Sometime during the day of July 7th Mrs. LaBree informed Ellis she wished to terminate their relationship. Thereafter Ellis removed his personal belongings from the house and put them in the car preparatory to moving out.

Later that night Ellis borrowed a .22 calibre pistol from a friend, telling the friend at that time that he needed it to kill a skunk which had become a nuisance.

He thereafter returned to the LaBree household and discussion took place between him and Mrs. LaBree. In the early hours of the morning of July 8th, Ellis, Mrs. LaBree and one of Mrs. LaBree's young children were seen on the street by several people.

Ellis and Mrs. LaBree were walking and the child was being carried in Mrs. LaBree's arms.

A short distance from the LaBree house Mrs. LaBree was killed and Ellis was seriously wounded when he shot himself twice in the chest.

The State's theory obviously was that Ellis deliberately killed Mrs. LaBree because she had rejected him.

Ellis testified in his own defense that he had attempted suicide and that Mrs. LaBree had been "accidently" killed when she attempted to prevent it.

Although at least one person saw the three participants in the shooting on the street just prior to the incident and several people, including a police officer, observed them immediately thereafter, no one testified to having actually observed the shots being fired.

In his instructions to the jury the presiding Justice said, among many other things,

"The definition of manslaughter is, whoever unlawfully kills a human being in the heat of passion on sudden provocation, without express or implied malice, shall be punished."

He continued,

"Well, what is the definition of manslaughter, so that you can distinguish it? You will remember I said in order for the State to prove murder, it must show malice aforethought, either express or implied, as I have already defined that term to you and will again. Manslaughter is an unlawful killing without malice aforethought, either express or implied. In connection with manslaughter—I think I should say whoever unlawfully kills a human being in the heat of passion on sudden provocation—if I didn't read it—without express or implied malice aforethought is guilty of manslaughter.

"Neither the passion of fear in and of itself nor the passion of revenge nor the passion induced by, accompanying or following an intent to commit a crime is in itself, does in itself constitute heat of passion on sudden provocation as defined or as stated in the law. The law does not permit a person to set up his own standard of conduct or to justify or excuse himself merely because his passions were aroused unless the circumstances in which he was placed and the facts with (sic) which he was confronted with such as would have aroused the passion of the ordinary, reasonable person similarly situated.

"So, the test to be applied in determining whether a killing was in the heat of passion, which will reduce murder to manslaughter, is whether or not at the time of the killing the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person to act rationally (sic irrationally) and without deliberation and reflection and act from

such passion rather than from judgment."

At the conclusion of the Court's instructions to the jury and before the jury retired to deliberate, the following colloquy took place between the defendant's counsel and the Court:

"COUNSEL: . . . . The Defendant would also request that, take exception—

"THE COURT: Wait a minute.

"COUNSEL: Takes exception to the definition of manslaughter as including a finding that there must be passion or provocation. It is the contention of the Defendant that manslaughter is simply an unlawful killing without malice aforethought, express or implied. One of the circumstances in ruling out malice aforethought may be that there was provocation or sudden passion, but the Defendant contends it is not necessary for this to be shown in order for a crime to be manslaughter rather than murder."

Case law in Maine has always been written in terms of "voluntary" homicide and "involuntary" homicide.

The terms "voluntary" and "involuntary" have come to be words of art. The meaning assigned the words in common parlance does not accurately describe the legal implications intended to be conveyed. For this reason we take this occasion to describe again the legal distinction between what has been commonly referred to as "voluntary" homicide and "involuntary" homicide.

A short review of the history of the law of homicide provides insight into the reasons for the coming into being of many of our rules of law of today.

Under English common law all persons convicted of homicide, neither justifiable

nor excusable, received the death penalty. The harshness of such practice was repugnant to many who founded what is now the United States.

The traditions of the English common law were so ingrained that the Colonists (and later the founders of the United States), refused to break away from the traditional English common law altogether. Rather, American State Assemblies of the early Eighteenth Century began to define murder into degrees in an attempt to limit the use of capital punishment. Michael & Wechsler, "A Rationale of the Law of Homicide," 37 Colum.L.Rev. 701, 703 (1937).[1]

Pennsylvania was the first to break from English precedent. Two years later in 1796 the Virginia Penal Reform Act provided that freemen could be executed only upon conviction of first-degree murder while all other homicides were to be punished by imprisonment. Note, "Capital Punishment in Virginia," 58 Va.L.Rev. 97, 102 (1972).

Society long has recognized that there is a vast difference in culpability between an act:

(a) bringing about death with an actual subjective premeditation or by conduct which objectively evaluated has a *high death-producing potential*; and

(b) the same conduct described in (a) above occurring while in the heat of passion and upon sudden and adequate provocation.

■ As a result, it became the law that when one kills another while in the heat of passion and upon adequate sudden provocation the homicide, even though intentional in fact or treated by the law as if intentional, is punishable as "manslaughter" not "murder."

---

1. See *McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), for an excellent summary of the evolution of the rules of law treating with unlawful homicide.

To this conduct the Courts apply the term "voluntary manslaughter."

■■■ In addition to "manslaughter" proscribed in numerous statutes cited in footnote 5 in State v. Northup, Me., 318 A.2d 489, 498 (1974), and that which results when a homicide otherwise punishable as "murder" is palliated in degree of severity to "manslaughter" because committed in the heat of passion upon sudden and adequate provocation, a homicide neither justifiable nor excusable is punishable as "manslaughter" when it results from conduct which neither is a felony nor embodies an actual subjective premeditation or an objectively high death-producing potential, but rather evidences only "criminal negligence" which as described in State v. Ela, 136 Me. 303, 308, 8 A.2d 589, 592 (1939), is ". . . negligence of a higher degree than that required to establish liability upon a mere civil issue . . . ." and ". . . involves a reckless disregard for the lives or safety of others."[2] Also: State v. Hamilton, 149 Me. 218, 239, 100 A.2d 234, 244 (1953).

In State v. Park, 159 Me. 328, 193 A.2d 1 (1963), this Court said:

"Whether there was any evidence from which the jury could find provocation and other elements reducing the offense to manslaughter, was a question of law for the determination of the Court. The jury is the judge of the facts and must take the law from the Court. State v. Wright, 53 Me. 328, 345. In the absence of any evidence from which the jury could find manslaughter, the Court properly withdrew the issue from their consideration. There was no error in failing to give the requested instructions." 159 Me. at 333, 193 A.2d at 4.

In that case the Court was addressing itself to a requested instruction as to "voluntary manslaughter."

■■■ In the case now before us we see nothing in the record which would permit the jury to consider that this homicide occurred while the slayer was in the heat of passion upon sudden provocation, nor do we find any place in the record such claim was ever suggested by the defendant.

Nevertheless, the presiding Justice chose to instruct the jury as to "voluntary manslaughter."

No instructions were given as to what the case law describes as "involuntary manslaughter."

The jury could reasonably have concluded from the instructions given it could find the defendant guilty of "manslaughter" rather than "murder" only if it found from the evidence there was a homicide committed by this defendant which was neither excusable nor justifiable but occurred while the defendant was in the heat of passion upon sudden and adequate provocation.

As we recently said in State v. Northup, supra, the Justice's charge should have contained an explanation of the elements of "involuntary manslaughter."

"The manner in which the jury finds that the killing was committed determines its unlawfulness (if it was unlawful) and the jury may find that it was unlawful because it was an unjustified and unexcused intentional killing or that

---

2. The "reckless disregard for the lives or safety of others" which can be an element of manslaughter is quite different in quality objectively from that reckless conduct which can be an element of "murder." "Reckless conduct" which, when viewed objectively is considered in law to have the equivalent effect of a subjective intention to kill, is traditionally described as "reckless and wanton and willful" conduct. Although it necessarily involves neither a subjective intention to kill nor a subjective awareness of the serious danger to which others are exposed, (State v. Lafferty, Me., 209 A.2d 647, 672, n. 5 (1973)) it is regarded in law as such a serious disregard of the obligation to exercise reasonable care so as not to unreasonably endanger the lives and safety of others as to be tantamount to a subjective intention to kill, and deserving of the same punishment.

it was unlawful because it was within the criminality category of proscribed *involuntary* killings. There is no crime until the State has proved one of the elements which makes the killing unlawful and the issue of how death was caused should be submitted to the jury with instruction as to the nature of both voluntary and involuntary homicides." 318 A.2d at 498.

The State argues defendant failed to preserve the now-claimed right to have the "involuntary manslaughter" instruction given.

■ We consider that the defendant saved the point on appeal although there was no request for a charge on "involuntary manslaughter" in those terms.

■ Discussion of the point is academic however.

In State v. Northup, supra, we decided that on the evidence there presented "involuntary manslaughter" was not open as a rational possibility to a jury acting reasonably [3] and, hence, the absence of an instruction on "involuntary manslaughter" caused no prejudice to defendant and could not constitute an obvious error "affecting substantial rights", Rule 52(b), M.R.Crim. P.

In the case at bar, however, the defendant has satisfied us that there was sufficient evidence from which a jury might rationally have reached a verdict of involuntary manslaughter and, therefore, the omission of an involuntary manslaughter instruction was prejudicial to defendant.

We hold that the failure of the presiding Justice to instruct concerning involuntary manslaughter when shown by the defendant, as here, to be prejudicial to him is sufficiently serious to be manifest error affecting substantial rights and requires reversal of the judgment of conviction.

Under the circumstances we have no alternative but to sustain the appeal.

The entry must be,

Appeal sustained.

All Justices concurring.

---

3. In that case the victim's heart had been pierced by a knife blade to a depth of 4-½ to 5 inches and a length of insulated electric wire had been tied around her throat tightly enough so that a band of hemorrhage in the larynx was visible at the time of the autopsy.