**STATE of Maine**

v.

**Valmore E. HILLIKER.**

Supreme Judicial Court of Maine.

Nov. 8, 1974.

Richard S. Cohen, Deputy Atty. Gen., Chadbourn H. Smith, Malcolm L. Lyons, Asst. Attys. Gen., Augusta, for plaintiff.

Daniel G. Lilley, Portland, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

ARCHIBALD, Justice.

Appellant was indicted, tried and convicted of felonious homicide punishable as murder. 17 M.R.S.A. § 2651. At the conclusion of the testimony defense counsel stated to the presiding Justice: "[W]e do request a Charge in this case, based on the facts, on manslaughter." This request was denied.

We do not necessarily approve the general language used in the requested instruction and our consideration of the issues discussed *infra* should not be so interpreted. Rule 30(b), M.R.Crim.P. However, our reasons for considering these issues, as we will analyze the facts hereinafter, will become apparent.

We deny the appeal.

### FACTS

The defendant, a career naval aviation mechanic, was stationed at the Brunswick Naval Air Station, and with his wife (the victim) and their children lived in a Capehart housing unit in Brunswick, known as 51 East Emanuel Drive, a two-story duplex house. The Hillikers utilized the second floor as sleeping quarters. There was also a bathroom on the second floor. They had occupied the house for slightly over three months prior to the date of the homicide.

On entering the front door one is faced immediately with a stairwell, leading to the second floor, which starts to ascend about three and one-half feet from this door. There are thirteen steps, the risers being about eight inches high and the treads being eleven inches in depth. On the left of the entry is a livingroom, in back of which is the kitchen where the telephone is installed.

This particular apartment had an exterior screen door opening outward and an interior wooden door opening inward, both of conventional size.

On the afternoon of the critical day Mr. Hilliker spent a good deal of time in an enlisted men's club at the Naval Air Station. From a series of witnesses it is apparent that he consumed a considerable quantity of intoxicating liquor. While there he met one Roy Kitterman, a First Class Aircraft Mechanic, with whom he had no prior acquaintance, so far as the record discloses. However, when the time came to leave, Mr. Kitterman, being of the opinion that appellant was "pretty drunk," offered to drive him home, with the understanding that Mrs. Hilliker would give him a ride back to the club thereafter so he could get his own car.

On arriving at the Hilliker home Kitterman assisted the appellant to the door where they were met by Mrs. Hilliker, who immediately stated, "this is no way to come home with children in the house." Appellant's response was, "I've got a right to come home like this if I want to . . . you've got your lovers." After this interchange Kitterman was introduced to Mrs. Hilliker who offered him a cup of coffee. They went into the livingroom where Kitterman remained while appellant and his wife immediately went into the kitchen. It was clear to Mr. Kitterman that an argument was ensuing, but he was unable to distinguish the exact words being used. However, Mrs. Hilliker did re-enter the livingroom with the coffee but returned at once, remarking that she had to make a phone call.[1] Kitterman was unable to pinpoint exactly the amount of time that appellant and his wife were in the kitchen

---

1. The following stipulation was entered: "[T]he defense and the State will stipulate that at 6:51 P.M. on April 16, 1971, Mr. Lazure, at the Shore Patrol headquarters on duty, received a call from a woman who identified herself as Mrs. Hilliker. She asked him to send someone out to 51 East Emanuel, and Mr. Lazure asked her the nature of the call, and she said 'never mind, just send someone out,' and then she hung up."

but limited the time to "well, 5, 10 minutes." In any event, Kitterman testified he heard "a loud voice, a male voice saying, 'well, why don't you kiss him too,'" and then observed Mr. Hilliker come out of the kitchen, walk in front of him without speaking and go up the stairs. The witness then testified, "I could hear him up there walking around." Hilliker's ability to negotiate the stairs without difficulty apparently surprised Kitterman because he testified, "He didn't appear drunk at that time."

Immediately thereafter Mrs. Hilliker emerged from the kitchen, went upstairs, returning almost instantly and saying either, "he has a gun up there, you better leave"; or, "he has a gun up there. I'm afraid he'll use it, you better leave." Whereupon Kitterman and Mrs. Hilliker went to the front door together and he departed, walking toward the street, Mrs. Hilliker remaining in the house. Kitterman testified that when he had gone "40 to 55 feet" from the door he heard a noise, turned around and observed Mrs. Hilliker coming down the front steps, walking toward him with her arms folded "around her." He then stated that as she got in the middle of the driveway, he "observed a gunshot, I saw the flash, and then I heard the report of the gun." He also testified that the shot came from the front doorway of the house and that he could see a male figure outlined therein. Mrs. Hilliker screamed, ran up the street a short distance, and fell in front of 45B East Emanuel Drive saying, "I'm hit."

At Kitterman's request the police were called but before they arrived appellant's nine year old son, Erik, came home and observed his father coming out of the upstairs bathroom. He asked where his mother was and was told by appellant that she was "at the police station." Erik then went to the phone, called the police station and learned that she was not there and, after reporting this to his father, was told

to "go to bed." When asked to describe his father, he testified: "His eyebrows were down like this, and he looked as though he were mad or something."

Shortly thereafter the police arrived and placed Mr. Hilliker under arrest. The police described appellant as not being intoxicated at the time and, as they were leaving the house with him, quoted him as saying: "The gun is upstairs, go get it."

A subsequent search of the apartment revealed no recently fired expended cartridge casings, nor did a search of the neighborhood reveal any expended bullets. However, a .22 caliber semi-automatic pistol was found under the blankets on the double bed in the master bedroom.[2] Additionally, on a downstairs table near where Mr. Hilliker had been standing when the police first entered the home was found a magazine holding *seven* rounds of .22 caliber long range ammunition, which would fit the .22 caliber pistol found in the bedroom. This magazine had a maximum capacity of *nine* rounds. A ballistics expert described the operation of this pistol as follows:

"A. Insert the clip in the base of the grip; to actuate the weapon, one pulls back on the slide in this manner, lets the slide slide forward, and the spring pressure in this manner, it picks up the top cartridge in the magazine and the clip, seats it in the chamber. At this time the gun is ready to fire simply by pulling the trigger.

Q. And the gun clipping holds nine shots?

A. Yes, sir.

Q. Now, after you fired the first round, being a semi-automatic, this other procedure is done automatically is that right, a new bullet is pushed up into the chamber, and

2. Two other non-automatic firearms, both .22 caliber, were discovered elsewhere in the apartment.

it's ready to fire, and you don't have to keep pulling back on the handle?

A. That's correct."

An examination of the apartment was otherwise negative except for a hole in the front screen door, fifty inches from the floor, which an expert witness testified was made by a lead object.

Post-mortem examination of Mrs. Hilliker's body revealed that her death was a result of hemorrhage caused by a small caliber bullet which entered the chest, piercing the heart "on the [venous] side of the circulatory system and exited on a more or less the same plane from the back." Because the damage was to the venous area of the heart, mobility would be possible "for several minutes" after receiving the injury.

An examination of the dressing gown Mrs. Hilliker was wearing did not reveal the presence of any nitrates in the area where it was penetrated by the bullet, leading to the conclusion that the muzzle of the weapon was at least four feet away when the shot was fired.

Since the entrance wound on Mrs. Hilliker's body was "in the mid portion of the anterior part of the chest just to the right of the mid-line" and since she was not facing the door when the shot witnessed by Mr. Kitterman was fired from the doorway, it becomes clear that the fatal wound must have been received *before* she emerged from the house. This conclusion is necessarily based on Mr. Kitterman's testimony *because there was no witness to the firing of the fatal shot*. We must assume from the verdict that the jury adopted Mr. Kitterman's testimony and found that the appellant had committed the homicidal act while he and his wife were alone inside the house.

## LEGAL ISSUES

With this rather detailed background before us, we now must inquire whether it was error to refuse the requested "manslaughter" instruction and, thus, to restrict the possible verdicts to either "not guilty" or "guilty of murder."

Manslaughter is defined by our statute in this language:

"Whoever unlawfully kills a human being in the heat of passion, on sudden provocation, without express or implied malice aforethought . . . or commits manslaughter as defined by the common law, shall be punished . . . .."

17 M.R.S.A. § 2551.

The above statutory language is commonly understood as providing punishment for an unlawful killing on two distinct legal theories, namely, "voluntary" or "statutory" manslaughter as distinguished from "common law" manslaughter.

■ As we have attempted to make clear beyond question, *voluntary* manslaughter is necessarily included within the concept of felonious homicide punishable as murder but, since such an unlawful killing results from heat of passion produced by sudden adequate provocation, the penal consequences are reduced. State v. Lafferty, 309 A.2d 647 (Me.1973); State v. Rollins, 295 A.2d 914 (Me.1972); State v. Wilbur, 278 A.2d 139 (Me.1971). Common law manslaughter is likewise included by statutory definition within the single generic crime of felonious homcide. State v. Northup, 318 A.2d 489 (Me.1974); *see also* State v. Ellis, 325 A.2d 772 (Me. Opinion dated October 3, 1974).

■ Initially, we deal with the requested instruction assuming it to be limited to *voluntary* manslaughter and, because of counsel's statement, to be based on the concept of malice as enunciated in Wilbur v. Mullaney, 473 F.2d 943 (1st Cir. 1973). This assumption becomes apparent from appellant's argument that the state is obligated to prove malice as an objective fact and, having introduced no evidence thereof, ·

"the only guilty verdict that could have resulted was guilty of manslaughter." As a result of the order of the United States Supreme Court,[3] the First Circuit retreated from its previously enunciated position that, under Maine law, the crime of murder required the state to prove "malice aforethought" as an independent element in addition to proof of an intentional and unlawful killing. Wilbur v. Mullaney, 496 F.2d 1303 (1st Cir. 1974). The legal premise, therefore, upon which this argument is based no longer exists.

However, the problem created by failing to give the requested instruction is not thus simplistically resolved. The claimed error does not vanish merely because one supportive argument has failed. Pursuant to Rule 52(a), M.R.Crim.P.,[4] we can only deny the appeal upon a determination that the trial was free of errors that affected "substantial rights" of the appellant. With that mandate before us, then, we must inquire if the appellant had established by facts in the record a right to have the jury determine, under an appropriate instruction, that the homicide should be reduced in degree to that punishable as voluntary manslaughter.

[4] An unlawful killing is punishable as voluntary manslaughter, "as when the act is committed with a real desire and purpose to kill but in the heat of passion occasioned by sudden provocation." State v. Pond, 125 Me. 453, 455, 134 A. 572, 573 (1926); see State v. Turmel, 148 Me. 1, 88 A.2d 367 (1952).

Heat of passion and sudden adequate provocation must exist contemporaneously. As we said in State v. Rollins, 295 A.2d 914, 920 (Me.1972):

"'Heat of passion' . . . is *by itself,* not controlling upon the question of whether the intentional killing of one human being by another shall be reduced in the severity of the punishment to be imposed. Additionally requisite is the factor that *adequate* provocation must have produced the 'heat of passion.'"

■ It seems self-evident that the presence, or absence, of "heat of passion" is a condition which a jury may infer from all the evidence before it. Likewise, it is the province of the jury to determine factually whether such condition is the product of "sudden provocation," and whether such provocation is adequate to produce this result "'in the mind of a just and reasonable man.'" State v. Park, 159 Me. 328, 332–333, 193 A.2d 1, 3 (1963); *see* State v. Rollins, 295 A.2d at 921; *see also* People v. Brunk, 258 Cal.App.2d 453, 65 Cal.Rptr. 727 (1968); People v. Brubaker, 53 Cal.2d 37, 346 P.2d 8 (1959).

■ However, there are definite limitations on the type of conduct deemed legally *adequate* to mitigate the punishment for a felonious homicide below that mandated for murder. Among the limitations is the well established rule that mere words alone, however inflammatory or opprobrious, "do not constitute sufficient provocation to reduce homicide from murder to manslaughter." State v. Park, 159 Me. at 332, 193 A.2d at 3 (1963). Standing for the generally well accepted proposition that mere words can never be a sufficient provocation to reduce the penal consequences of felonious homicide to those proscribed for voluntary manslaughter, see People v. Williams, 6 Ill.App.3d 713, 286 N.E.2d 570 (1972); People v. Pecora, 107 Ill.App.2d 283, 246 N.E.2d 865 (1969); Lang v. State, 6 Md.App. 128, 250 A.2d 276 (1969).

3. "Facts and opinion, 473 F.2d 943.

"Jan. 14, 1974. On petition for writ of certiorari to the United States Court of Appeals for the First Circuit. Petition for writ of certiorari granted, judgment vacated and case remanded to the Court of Appeals for further consideration in light of State v. Lafferty, Me., 309 A.2d 647 (1973)." 414 U.S. 1139, 94 S.Ct. 889, 39 L.Ed.2d 96 (1974).

4. "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Rule 52(a), M.R.Crim.P.

■ We have consistently held, where the State has proved an unlawful killing beyond a reasonable doubt, if a defendant would reduce the penal consequences below those of murder, he must demonstrate by a fair preponderance of the evidence the reductive factors, namely, that the killing was in the heat of passion on sudden adequate provocation. State v. Lafferty, *supra;* State v. Rollins, *supra;* State v. Wilbur, *supra.* This rule, of course, does not compel the defendant, *personally,* to become a witness but allows the introduction of evidence of such palliating factors, whether the evidence be generated by the direct or cross-examination of State's witnesses, or by witnesses for the ₎defense.[5]

■ Our Court has held that, because the *existence of evidence* from which reductive factors could be inferred is a question of law, where there is *no such evidence* an instruction defining the elements of voluntary manslaughter is not required. State v. Park, *supra;* see State v. Northup, *supra.* Conversely, where such evidence *does legally exist,* the jury, being the sole judge of the facts, must be given an opportunity to weigh this evidence and determine whether the defendant has established by a fair preponderance of the evidence that the act was done in the "heat of passion, on sudden provocation, without express or implied malice aforethought." State v. Duguay, 158 Me. 61, 178 A.2d 129 (1962); *see also* State v. Ellis, *supra.*

The Missouri Court has recently stated the rule as follows,

> "unless we can declare as a matter of law that there is 'an entire absence of evidence upon which to rest a verdict of guilty of manslaughter' . . . it is the duty of the trial court to give an instruction on manslaughter."

State v. Patterson, ˙484 S.W.2d 278, 279 (Mo.1972); *see also* Banks v. State, 227 Ga. 578, 182 S.E.2d 106 (1971).

■ Applying these rules to the instant facts we must determine if legal evidence is in the record which would support a finding by a rational jury that the defendant has met the burden of proving the reductive factors by a fair preponderance of the evidence.

With the exception of the verbal interchange between the defendant and Mrs. Hilliker when Kitterman and defendant first entered the home, Kitterman's testimony that an "argument" was ensuing between them in the kitchen, such inferences as may be drawn from the telephone call to the Shore Patrol, and the defendant's statement as he left the kitchen to go upstairs, the record is silent as to any other contact between the defendant and the deceased. Stated otherwise, what actually may have occurred between the defendant and his wife in the kitchen, or what type of interchange may have happened upstairs, or on the stairway when the fatal shot was fired is not reflected in the record. The defendant himself is the only living person who could have supplied this information and he chose not to testify.

If the Justice below had given the voluntary manslaughter instruction he would have ignored the well established legal principle that mere words do not constitute a sufficient provocation to underlie reducing the penal consequences of a felonious homicide below those mandated for murder. His ruling correctly recognized that the defendant, having the burden of proving by a fair preponderance of the evidence that the felonious homicide was committed in the heat of passion on sudden ad-

---

5. Neither can it be successfully argued that the practical effect of this legal doctrine is to compel a criminal defendant to be a witness against himself where the circumstances of a particular case leave such a defendant as the sole person having knowledge of mitigating or palliating factors. *See also* Yee Hem v. United States, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904 (1925); People v. Bornholdt, 33 N.Y.2d 75, 350 N.Y.S.2d 369, 305 N.E.2d 461 (1973), cert. denied April 1, 1974, 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109; Napue v. United States, 432 F.2d 1230 (7th Cir. 1970).

equate provocation and having introduced no evidence upon which such a finding could rationally be predicated, was not entitled to an instruction on voluntary manslaughter. State v. Park, *supra*.

Having now determined that no reversible error was committed by failing to instruct the jury on the elements of *voluntary* manslaughter, we must next consider whether it was error not to include an instruction on *involuntary* manslaughter.[6] We deem it a conservative approach to test this issue under the obvious error doctrine of Rule 52(b), M.R.Crim.P., since the error, if such it was, was not brought to the attention of the Court.

■ Initially, under the holding in Northup, it is now clear that the failure to instruct the jury on *involuntary* manslaughter is error since the defendant would have been entitled to such an instruction if he had requested it. *Northup*, 318 A.2d at 498. However, because the instruction was not requested, unless the error "is so highly prejudicial and so taints the proceeding as virtually to deprive the aggrieved party of a fair trial," [7] a reversal of the conviction is not mandated.

Guided by this standard, we consider the entire record in order to appraise the probable effect of the failure to give the instruction. We recall that there was no eyewitness to the homicidal act and, as was the situation in *Northup,* there was no tes-

timony from the defendant nor anyone else explanatory thereof.[8] The jury only knew that a bullet fired from a distance of over four (4) feet traversed the body of the deceased, and could logically infer that another shot was intentionally fired at the deceased thereafter by the defendant from the doorway of the house. The jurors likewise knew that deliberation, in some degree at least, was required to insert the clip into the .22 automatic pistol and, thereafter, to inject the first shell from the clip into the chamber. They likewise knew that the expended casings were automatically ejected upon the pistol's being fired and that these casings, although obviously ejected within the house, were never recovered. Since the defendant was seen by his son shortly after the shooting coming from the bathroom, the jurors might assume that he had disposed of these casings by flushing them down the upstairs toilet. In short, as was the case in *Northup* (and dissmilar to the facts in *Ellis*), there was an absolute lack of evidence from which the jury could have found that the killing was unintended, thus not requiring the jury to be instructed on the elements of involuntary manslaughter.

The defendant has failed to satisfy this Court that manifest injustice resulted from the failure to instruct on involuntary manslaughter. As in *Northup,* and unlike *Ellis,* "we see no reasonable possibility that the jury, if so instructed, would have

---

6. While the request for a "manslaughter charge" was generalized, it is clear from the comments of defense counsel when the request was made that he referred to *voluntary* manslaughter. This conclusion is further supported by defendant's brief which limits the argument by citing as sole supporting authority Wilbur v. Mullaney, *supra*. The record, or brief, makes no argument that it was error not to instruct on the elements of *involuntary* manslaughter.

7. State v. Langley, 242 A.2d 688, 690 (Me. 1968).

8. The results reached in *Northup* and *Ellis*, although both dealing with the failure to in-

struct on involuntary manslaughter, are consistent. In *Ellis* the defendant testified and sought to excuse the homicide as being the result of an accident. In the process of so doing Ellis presented *evidence* from which the jury might, under appropriate instructions, conclude that the state had failed to prove a felonious homicide punishable as murder. Therefore, the failure to instruct on involuntary manslaughter was held to be prejudicial error, affecting substantial rights and required a reversal of the conviction. Such was not the factual background in *Northup* nor is such comparable testimony in the record before us.

found that the killing . . . was unintended." *Northup,* 318 A.2d at 500.

■ The remaining point argued on appeal deals with the admissibility of certain evidence. In rebuttal, the state had introduced the testimony of a state police officer who had made certain measurements which included the positions of the entrance and exit wounds, the elevation of the hole in the screen door, and elevation of the stairs leading to the second floor. He was allowed to express an opinion that the shot was fired from some position on the stairs above the landing. We do not feel that this testimony was prejudicial.

The officer had measured the distance from the decedent's heel to the entrance and exit wounds, finding them to be respectively 44½ and 42½ inches. The depth of the decedent's chest was 8 inches. The hole through the screen door which, arguably, was made by the expended bullet was 50 inches from the floor. There was testimony that a bullet, after penetrating tissue, has a tendency to "tumble." Based on these facts the witness was allowed to express the following opinion:

"She would have had to have been standing somewhere on the stairs with the height of the exit hole level with or higher than the height of the hole in the screen door, and this would depend entirely on the angle with which the bullet exited the body; the tumbling effect would have changed the distance up and down the stairs.

He would have to have been standing somewhere the other side of her up the stairs so that she was between him and the screen door."

It seems to us that the jury could have reached identically the same conclusion by the application of the most rudimentary physical laws. *Assuming* that the witness did not have sufficient qualifications to express the opinion he did, we view his testimony as merely cumulative in light of the undisputed facts in the record and, there-

fore, non-prejudicial. Thigpen v. State, 49 Ala.App. 233, 270 So.2d 666 (1972).

The entry must be:

Appeal denied.

All Justices concurring.