STATE of Maine

v.

Michael D. STACKPOLE.

Supreme Judicial Court of Maine.

Dec. 12, 1975.

Charles K. Leadbetter, Chadbourn H. Smith, Asst. Attys. Gen., Augusta, Anthony J. Cirillo, County Atty., Skowhegan, for plaintiff.

Eames & Eames by Donald E. Eames, Skowhegan, Bernard R. Cratty, Waterville, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

DELAHANTY, Justice.

Michael D. Stackpole was indicted by the Somerset County Grand Jury for a felonious homicide punishable as murder. From a jury verdict finding him guilty of that crime, he has appealed. We deny the appeal.

The trial jury which decided the defendant's guilt was entitled to find the following facts.

The defendant, an eighteen-year-old farmhand with a seventh-grade education and an estimated I.Q. of 76, was a second cousin and acquaintance of the victim, a ten-year-old female named Roxanne Gilkey. Shortly after 3:00 p. m. on January 31, 1972, on a clear, but cold day, the defendant visited the home of Emma Williams, the victim's grandmother, with whom Roxanne was then living. Roxanne asked Mrs. Williams's permission to go for a ride in Stackpole's snowmobile, and the pair left the Williams house. With the exception of the defendant, Mrs. Williams was the last person who saw Roxanne alive.

Roxanne's body was discovered by a search party, tied to a tree in a wooded area known as Baird's Bog at approximately 8:30 p. m. that same day. The temperature at that time was approximately zero degrees. The victim's hands were tied together with baling twine, which had then been wrapped tightly around her neck and secured to the tree. She had been struck twice in the head. The body was unclothed from the waist down, although the victim's slacks were draped across her legs. Her boots were lying in the snow about three feet from the body, her leotards were hanging in a nearby tree, and her underpants, both sides torn out of them, were found in the snow at a distance of seventeen feet from the body. The leather belt which Roxanne had been wearing lay in two pieces near the foot of the body.

Roxanne's death was caused by an acute heart failure brought on by a combination of strangulation and exposure to the elements. Although the twine around her neck was insufficient to cause immediate death by strangulation, it would have been effective to bring about death over a longer time period. That Roxanne was left partially undressed in sub-freezing temperatures served to hasten the process.

The defendant appeared at the Bemis farm, where he was employed parttime, at approximately 4:30 p. m. While he was there, Roxanne's grandmother, concerned about the girl's whereabouts, called on the phone and Stackpole spoke briefly with her. When he hung up the phone, Mrs. Bemis asked the defendant about Roxanne, and his only response was, "She might be dead now."

The defendant was first questioned by police officers concerning Roxanne on the evening of January 31, before her body was found. He admitted having taken her for a snowmobile ride that afternoon, but said that he had left her with a "hippy" who came along on another snowmobile and offered to give Roxanne a ride home after Stackpole's vehicle developed engine problems. After the body was discovered, Stackpole was again questioned, this time by two officers in a police car, with the defendant's father also present. It was on this occasion, after he had been given *Miranda* [1] warnings by one of the officers, and with some minimal prompting by his father, that the defendant volunteered, "I did it; I didn't mean to do it; I don't know why I did it." Moments later, in response to a question from one of the officers, the defendant admitted that he had "killed" Roxanne Gilkey. He was then placed under arrest.

At trial the defendant offered an exculpatory scenario as to what had occurred between the victim and himself in the Baird's Bog area. The essence of Stackpole's story was that the ten-year-old Roxanne had made sexual overtures toward him. The defendant claimed that he protested, but that Roxanne taunted him. Her remarks, Stackpole testified, angered him, and caused him to strike her in the head with his hand, tie her to the tree, and abandon her at Baird's Bog.

Defendant's appeal assigns the following four principal errors to the trial court:

(1) Omission of a cautionary jury instruction as to the "gruesomeness" of certain photographs which were admitted into evidence;

(2) 'Improper expression of an opinion regarding the facts of the case in the charge to the jury;

(3) Instruction to the jury that the burden was on the defendant to reduce the charge from murder to manslaughter; and,

(4) Omission of an instruction on involuntary manslaughter.

## I.

### The ommission of an instruction as to the photographs.

■ The defendant argues that the presiding Justice should have included in his charge to the jury, a cautionary instruction regarding two "gruesome" photographs which were admitted into evidence. The defendant failed to request such an instruction from the presiding Justice, nor did he interpose a specific objection to the charge as given.[2] The omission of such an instruction would be grounds for reversal only in the rare circumstance that it amounted to an "obvious" error "affecting substantial rights." M.R.Crim.P. 52(b). *State v. Armstrong,* Me., 344 A.2d 42, 49 (1975); *State v. Scott,* Me., 343 A.2d 177, 178 (1975); *State v. Collins,* Me., 297 A.2d 620, 631 (1972).

■ The photographs were relevant to the issues before the court and their probative value was not outweighed by the danger of prejudice to the defendant. This Court has repeatedly held that the admissibility of potentially prejudicial photographic evidence is a matter within the discretion of the trial court. *State v. Berube,* Me., 297 A.2d 884, 888 (1972); *State v. Rollins,* Me., 295 A.2d 914, 917 (1972);

---

1. *Miranda v. Arizona,* 384 U.S. 434, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. M.R.Crim.P. 30(b): (in pertinent part).
 No party shall assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing and presence of the jury.

*State v. Coty,* Me., 229 A.2d 205, 214 (1967). One of the photographs, which depicted the neck and head of the victim, was introduced for the purpose of aiding the jury to understand the testimony of the State's medical expert as to the cause of death. When this photograph was introduced, the presiding Justice cautioned the jury that they were to consider the photograph only as it related to the testimony of the medical expert.[3] The trial court's prompt and appropriate admonition was entirely adequate to mitigate any asserted prejudice that the introduction of the photograph might have worked on the defendant. The second photograph depicts the victim's body and the immediate surroundings at the scene of the crime. The presiding Justice did not abuse his discretion in admitting the photographs. The defendant's argument that he was substantially prejudiced by the absence of a jury instruction as to the photographs is rejected.

## II.

The allegedly improper expression of opinion by the presiding justice as to the facts of the case.

▮ The presiding Justice gave, inter alia, the following instruction to the jury:

Now in Maine, unlike other states that have murder in the first, second and third degree, we don't. We have when there's an unlawful killing, unjustified either because of self-defense, and there's no such issue here, or because of not guilty by reason of insanity, and that's been removed; if a person is unlawfully killed, the defendant is guilty of either murder or manslaughter.

Appellant claims that this portion of the charge contains an expression of opinion by the trial court on the facts of the case in violation of 14 M.R.S.A. § 1105.[4] The defendant isolates the phrases "when there's an unlawful killing"; "there's no such issue here"; "that's been removed"; and "the defendant is guilty of either murder or manslaughter," and asserts that the combined effect is an impermissible expression of the trial court's opinion. We reject this sort of piecemeal attack on the presiding Justice's charge. We have consistently held that the propriety of an instruction must be analyzed by looking at the charge as a whole rather than taking individual statements out of context. *Scott,* supra, 343 A.2d at 179 (1975); *State v. Devoe,* Me., 301 A.2d 541, 546 (1973).

The jurors were made sharply aware of the fact that the responsibility of decision was theirs and theirs alone. We said in *State v. Jewell,* Me., 285 A.2d 847, 852 (1972), where as in the case at bar, the defendant argued that the trial court had improperly expressed the opinion that the defendant was guilty, "We have carefully reviewed the charge and find that no reasonable jury could properly infer from its language any such expression of opinion in violation of 14 M.R.S.A., § 1105."[5]

---

3. "This picture is going to be shown to the jury for whatever assistance it may be to you in understanding the testimony of Dr. Goodof. You will recall that his testimony was that death resulted from a combination of asphyxia by ligature and exposure to the elements. And it's hard for a doctor in the woods to describe the condition of the neck. So this is being shown to you for only that purpose. Now, pictures of this sort are repulsive to look at, but you are supposed to be like doctors. You are supposed to look at it calmly and in a detached way, and only for the purpose that I am permitting you to see it, to see the condition of the neck."

4. 14 M.R.S.A. § 1105 reads as follows:
   During a jury trial the presiding justice shall rule and charge the jury, orally or in writing, upon all matters of law arising in the case but shall not, during the trial, including the charge, express an opinion upon issues of fact arising in the case, and such an expression of opinion is sufficient cause for a new trial if either party aggrieved thereby and interested desires it, and the same shall be ordered accordingly by the law court on appeal in a civil or criminal case.

5. We note that the appellant at the conclusion of the instructions made no objection

## III.

The instruction that placed the burden on the defendant to reduce the charge from murder to voluntary manslaughter.

■ The trial court gave instructions on the elements of both murder and voluntary manslaughter,[6] and explained that, if the jury concluded beyond a reasonable doubt that the defendant had unlawfully killed the victim, they might then find him guilty of either of these offenses.[7] The court additionally instructed the jury that the burden was on the defendant to prove, "by the greater weight of the evidence," that he acted in the heat of passion in order to reduce the offense from murder to voluntary manslaughter. This instruction embodied the then Maine rule that the State having proved, beyond a reasonable doubt, that the defendant had committed a voluntary and intentional homicide, not justifiable or excusable, the defendant was then required to prove, by a preponderance of the evidence, that the homicide had been committed in the heat of passion on sudden provocation in order to reduce the offense from murder to voluntary manslaughter. In *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975),[8] this rule was held to violate the Fourteenth Amendment in that it failed to comport with the require-

ment, inherent in the Due Process Clause, that the prosecution prove every essential element of a criminal offense beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375 (1970). The defendant contends that a reversal and new trial are required because the trial court's instruction on the burden of proving voluntary manslaughter is retrospectively erroneous in light of *Wilbur.*

■ While we readily agree with the defendant's premise, that the challenged instruction is defective under the *Wilbur* standard, we must reject his conclusion. The defendant cannot claim that the voluntary manslaughter instruction that was given constituted a reversible error, for the fundamental reason that, on the evidence in the case, *no* voluntary manslaughter instruction was warranted.

Our careful study of the record convinces us that there is an entire absence of evidence upon which to rest a verdict of guilty of voluntary manslaughter. *State v. Hilliker,* Me., 327 A.2d 860, 866 (1974); *State v. Park,* 159 Me. 328, 333, 193 A.2d 1, 4 (1963). In *Park,* we said:

Whether there was any evidence from which the jury could find provocation and other elements reducing the offense [from murder] to manslaughter was a

to the court's alleged intrusion upon 14 M.R.S.A. § 1105, as he was required to do under M.R.Crim.P. 30(b).

6. Murder was defined as follows:
   "Whoever unlawfully kills another human being with malice aforethought, either express or implied, is guilty of murder." This is, of course, essentially the statutory definition of murder. 17 M.R.S.A. § 2651. Voluntary manslaughter was defined in this manner:
   "Whoever unlawfully kills a human being in the heat of passion without malice express or implied is guilty of manslaughter." This conforms to the first part of the definition of manslaughter set out in 17 M.R.S.A. § 2551. We note that the presiding Justice's instruction was confined to the elements of voluntary manslaughter and

made no mention of involuntary manslaughter, which is referred to in 17 M.R.S.A. § 2551 as "manslaughter as defined by the common law." See Part IV of this opinion.

7. Maine has historically taken the position that murder and manslaughter are not separate crimes but rather different degrees of the generic offense of felonious homicide. See *State v. Conley,* 39 Me. 78, 87–88 (1854).

8. At the time this case was argued, the United States Supreme Court had not yet announced its decision in *Wilbur,* and the parties accordingly addressed themselves to the First Circuit's opinion in the case, *Wilbur v. Mullaney,* 496 F.2d 1303 (1st Cir. 1974). Since the First Circuit's decision was affirmed by the Supreme Court, we consider this appeal in light of *Wilbur* as finalized.

question of law for the determination of the Court. . . . In the absence of any evidence from which the jury could find manslaughter, the Court properly withdrew the issue from their consideration.

■ There must accordingly be *some* evidence to generate the issue that the killing occurred in the heat of passion upon sudden provocation before a voluntary manslaughter instruction is warranted. If the evidence is insufficient as a matter of law, the defendant has no right to have the jury instructed on voluntary manslaughter. *Hilliker,* supra; *State v. Northup,* Me., 318 A.2d 489, 498 (1974). The test that we formulated in *Hilliker* for measuring the legal sufficiency of the evidence of provocation is whether a rational jury could predicate a finding of voluntary manslaughter thereon. 327 A.2d at 866.

*Park* is relevant to the case now before us for a second reason. There, we applied the plain rule of law that "[W]ords alone do not constitute sufficient provocation to reduce homicide from murder to manslaughter." 159 Me. at 332, 193 A.2d at 3. In *Hilliker,* we once again endorsed this rule. 327 A.2d at 865. Since words alone are legally insufficient to establish adequate provocation, it is clear that if no evidence of provocation beyond mere words is introduced at trial, the defendant is not entitled to any instruction on voluntary manslaughter.

■ In the instant case, the only evidence of provocation is the defendant's own testimony that the victim taunted him when he refused her alleged offer to engage in sexual intimacies.[9] The presiding Justice apparently reasoned that this evidence was sufficient to entitle the defendant to a voluntary manslaughter instruction. We are convinced, however, that this determination was incorrect under *Park* and *Hilliker,* supra, in which we held, *as a matter of law,* that words alone are not enough to establish adequate provocation. It follows that Stackpole was not entitled to the voluntary manslaughter instruction.[10]

Since the trial court erred by giving *any* instruction on voluntary manslaughter, the defendant cannot now claim that he was prejudiced merely because the instruction on voluntary manslaughter which was in fact given has retrospectively been determined to be deficient. We need do no more than reiterate what we said in *State v. Lafferty,* Me., 309 A.2d 647, 661 (1973): "Since the instruction complained of went beyond that which the record required to be given, the appellant has no cause to complain." See also *Brine v. State,* Me., 264 A.2d 530, 535 (1970). Other jurisdictions which have confronted this problem agree that a defendant convicted of a certain degree of homicide cannot complain of a faulty instruction on a defense or lesser-grade offense, when such instruction was unwarranted on the facts of the case. *Hackney v. State,* 206 Ga. 64, 55 S.E.2d 704, 706 (1949); *People v. Belcher,* 395 Ill. 348, 70 N.E.2d 201, 202 (1946).

We were confronted with an issue of similar import in *State v. Millett,* Me., 273

9. The presiding Justice gave the following instruction on this point:
Here . . . the defendant claims that he acted because of a threat made, the threat being—this is what he says, as I recall it—that he didn't want to have any sexual relations of any kind, he didn't use these words, with this girl. But she said to him, "If you don't, I will tell everybody about it, including my grandmother."

10. Our conclusion that the trial court erred by giving an instruction on voluntary man-

slaughter is entirely consistent with *Wilbur.* In a footnote to that case, the Supreme Court pointed out that "Many states do require the defendant to show that there is 'some evidence' indicating that he acted in the heat of passion before requiring the prosecution to negate this element by proving the absence of passion beyond a reasonable doubt," and added, "Nothing in this opinion is intended to affect that requirement." 421 U.S. at 701, n. 28, 95 S.Ct. at 1891, n. 28, 44 L.Ed.2d at 521, n. 28.

A.2d 504 (1971). There, the trial court's charge detailed for the jury the law of self-defense then recognized in Maine. On appeal, we rejected the long-standing Maine rule on self-defense, holding that it was error to give conflicting instructions that the defendant must carry the burden of proving that he acted in self-defense by a fair preponderance of the evidence *and* that if upon the whole evidence the jury entertained a reasonable doubt as to whether the homicide was excusable, the jury should acquit. Instead, we adopted the majority rule that the defendant bears the burden of producing evidence sufficient to raise the issue of self-defense, and concluded, citing *Park,* that the evidence was insufficient, as a matter of law, to generate the issue of self-defense. In so holding we stated:

> In the instant case the defendant gains nothing from the fact that an instruction, now and for the first time held to be erroneous, was given with relation to an issue not properly raised for jury consideration. When the jury was permitted to consider the claim of self-defense at all, the defendant was accorded more than he was entitled to on the evidence presented. Under these circumstances we treat the instruction with respect to burden of proof as mere harmless error in no way prejudicial to the defendant and in no sense ground for reversal of a conviction fully supported by the evidence. Id. at 511.

We conclude that the voluntary manslaughter instruction did not affect any substantial rights of the appellant and must be disregarded. M.R.Crim.P. 52(a); *Hilliker,* supra, 327 A.2d at 865.

## IV.

### The absence of an instruction on involuntary manslaughter.

■ As a final ground for reversal, the defendant asserts that the presiding Justice erred by failing to instruct the jury on the elements of involuntary manslaughter or, under our statute, "manslaughter as defined by the common law." 17 M.R.S.A. § 2551.[11] The defendant, however, failed to request an instruction on involuntary manslaughter and made no objection to the charge on the ground that it lacked such an instruction. As we discussed in Part I, the scope of our review is limited by M.R. Crim.P. 30(b) and 52(b) to the question of whether this was an obvious error affecting substantial rights of the defendant. As the issue was phrased in *Northup,* the question is whether "the Justice's failure to give the instruction resulted in manifest injustice such as virtually to deprive the Defendant of a fair trial." 318 A.2d at 499.

*Northup* suggests that we approach this problem by referring to the entire record and assessing the effect of the omission of the instruction in light of all the evidence. Id. see also *Hilliker,* supra, 327 A.2d at 867. Virtually the only evidence in the record here which might have led a jury to return a verdict of involuntary manslaughter is the defendant's own rather predictable disclaimer ("I didn't mean to do it.") and the speculative testimony of a psychiatrist that the defendant "might have some difficulty in fully realizing to himself what had actually happened." Reading the record in its entirety, however, it becomes clear that these two fragments of evidence are grossly outweighed by evidence that the defendant knew and intended the natural consequences of his acts. Perhaps the most decisive item of evidence in this re-

11. In *State v. Ellis,* Me., 325 A.2d 772, 776 (1974), we described involuntary manslaughter in this manner: "[A] homicide neither justifiable nor excusable is punishable as 'manslaughter' when it results from conduct which neither is a felony nor embodies an actual subjective premeditation or an objectively high death-producing potential, but rather evidences only 'criminal negligence' which as described in *State v. Ela,* 136 Me. 303, 308, 8 A.2d 589, 592 (1939), is '. . . negligence of a higher degree than that required to establish liability upon a mere civil issue . . .' and '. . . involves a reckless disregard for the lives or safety of others.'"

gard is the defendant's statement, shortly after he left his victim bound to a tree in the woods that "she might be dead now." We make reference to this statement only as an example of the convincing array of evidence which rebuts any inference that the killing was unintended or accidental. Guided by both *Northup* and *Hilliker,* "[W]e see no reasonable possibility that the jury, if so instructed, would have found that the killing . . . was unintended." *Northup,* 318 A.2d at 500.

This case is distinguishable from *State v. Ellis,* Me., 325 A.2d 772, 776–77 (1974) where we held under the authority of *Northup,* that the failure of the presiding Justice to give an instruction on involuntary manslaughter was manifest error. In *Ellis,* the circumstances of the killing were sufficiently ambiguous that a jury verdict of involuntary manslaughter was at least a reasonable possibility. The facts of this case, by contrast, are not susceptible of such an interpretation. We must accordingly reject the defendant's contention that the omission of an involuntary manslaughter instruction constituted a manifest error necessitating a reversal.

The entry must be:

Appeal denied.